996 So.2d 973 (2008)
STATE of Louisiana
v.
Henry Joseph ANDERSON.
No. 2006-KA-2987.
Supreme Court of Louisiana.
September 9, 2008.
Rehearing Denied October 31, 2008.
*980 Capital Appeals Project, Jelpi Pierre Picou, Jr., Letty S. DiGiulio, for appellant.
James D. Caldwell, Attorney General, Jerry L. Jones, District Attorney, John Michael Ruddick, Assistant District Attorney, for appellee.
JOHNSON, Justice.
On October 11, 2000, a Ouachita Parish grand jury indicted the defendant, Henry J. Anderson, for the September 29, 2000, first degree murder of Oneatha Brinson, in violation of LSA-R.S. 14:30. Trial commenced on April 25, 2005. On April 27, 2005, the jury returned a unanimous verdict of guilty as charged. After the penalty phase, the jury unanimously recommended a sentence of death, after finding two of the three aggravating circumstances, namely, that the victim was older than 65 years old, LSA-C.Cr.P. art. 905.4(A)(10); and that the offense was committed in an especially heinous, atrocious, or cruel manner, LSA-C.Cr.P. art. 905.4(A)(7). On June 16, 2005, the trial judge imposed the sentence of death by lethal injection in accordance with the jury's verdict.[1]
The Defendant, brings this direct appeal of his conviction and sentence to this Court *981 pursuant to La. Const. art. V, § 5(D)[2], raising 19 assignments of error. For the reasons that follow, we find that none of the arguments put forth constitute reversible error, and affirm the defendant's conviction and sentence.

FACTS
One week before her death, the victim, 85-year-old Oneatha Brinson, hired defendant, Henry Joseph Anderson, for the first time to cut the grass at her home in Monroe, Louisiana, having received a referral from her neighbor. Mrs. Brinson paid defendant in cash.
On Friday morning, September 29, 2000, defendant returned to Mrs. Brinson's home in hopes of lining up more yard work, but Mrs. Brinson was not home. Defendant returned to the victim's home later that afternoon, riding his bicycle. Given the late hour, the two tried to arrange a time in the near future for the work to be done. The following day was not convenient for Mrs. Brinson, as she told defendant she was planning to go to a football game, so the two went inside Mrs. Brinson's home to consult her calendar, which was in her kitchen. Once inside, Mrs. Brinson offered defendant a cold drink, and he accepted a glass of water. Defendant then removed a butcher knife from a wall rack, stabbed Mrs. Brinson over 10 times, and left her to die on her kitchen floor. At one point, Mrs. Brinson tried to raise up, so defendant took the drinking glass she had offered him earlier and beat her on the head with it. Defendant washed the blood from the knife and the glass and put them both away. Defendant then went through Mrs. Brinson's house to find items he could steal. He took some coins, a small TV/VCR combination, and the keys to Mrs. Brinson's car. Defendant placed his bicycle in the trunk and left the scene in the victim's white Cadillac.
On Saturday, September 30, 2000, a little before 6:30 p.m., the victim's sister, Tina Stephenson, and Stephenson's daughter, Karen Hudson, the victim's niece, arrived at the victim's house. The women had planned to go to the University of Louisiana at Monroe (ULM) football game, as they were season ticket holders. Stephenson noticed that her sister's car was not in the driveway, but she just assumed that Mrs. Brinson was at evening mass, so she used her key to let herself into her sister's home. Upon entering, Stephenson was startled to see her sister's lifeless body sprawled on the kitchen floor, with dried blood all around, and the victim's purse and its contents scattered on the floor. When Stephenson screamed, her daughter, Hudson, came running in. Hudson attempted to call 911, but the kitchen telephone cord had been ripped from the wall, so she made the call from the adjacent room.
When Monroe Police Department officers arrived, the morning newspaper for that day (September 30, 2000) was still uncollected at the front door. They checked Mrs. Brinson for vital signs, and given the stiffness of the victim's body and the dried and darkened blood on the scene, the officers estimated that the victim had been dead for at least several hours. A Ouachita Parish Coroner's Office deputy pronounced the victim dead on the scene.
The officers processed the scene and took photographs. They detected no sign of forced entry to Mrs. Brinson's home. However, upon investigating the house, *982 the police noted an office safe was standing open with several coins strewn on the floor, suggesting that the area had been rifled through, and perhaps items taken from the safe. In the victim's bedroom, the officers noticed an obvious vacant place on the bureau opposite the bed. A Cablevision line was hanging loose from the wall suggesting that a television had been removed. Nearby, the officers located an owner's manual for a "Symphonic" brand 13" TV/VCR combination.
The officers learned from the victim's relatives that the victim's car was missing. The police immediately issued an all points bulletin for a 1989 white, four-door Cadillac Deville. At approximately 10:00 p.m., while officers were still processing the crime scene, a deputy with Ouachita Parish Sheriff's Office (OPSO) located and stopped Mrs. Brinson's stolen vehicle with three occupants inside. Detective Doug Tarver left the crime scene at the Brinson home and relocated to 102 Stonegate in the Tanglewood area, where several OPSO officers had the three suspects who had been in the vehicle when it was stopped. Henry Patrick, Rashon Johnson, and Larry Thomas were handcuffed and on the ground. Several OPSO vehicles were on the scene, and a crowd of onlookers was beginning to gather. Defendant was lurking about close to the scene at 102 Stonegate, which drew Det. Tarver's attention, and caused him to collect defendant's name, address, and date of birth. Since the OPSO deputies indicated that only three occupants had been in the victim's car, only those three suspects were transported, separately, to Monroe Police Department for questioning.
The three suspects were advised of their Miranda rights. Each of the three suspects was questioned individually, and it became immediately apparent by their candid shock when they learned that the interview was not with respect to a stolen car, but rather, the police were questioning them about a homicide, that they had not been involved in the murder. Each suspect related that defendant, Henry Anderson, had been the first person to show up in the Tanglewood neighborhood driving the Cadillac the day before, and that he had subsequently "loaned" the vehicle to Marion Roberson, a/k/a Punchie, whom they had just dropped off, when OPSO stopped them. Based on that information, Det. Tarver compiled a photo line-up, and each of three suspects identified defendant. Henry Patrick also told the officers that defendant had been present at the Stonegate scene when they were taken into custody. In addition, Larry Thomas admitted that he had purchased some bags of coins from defendant earlier. Thomas called his sister, Diane Thomas, who brought the bags of coins to Monroe Police Department.
On October 2, 2000, defendant was arrested at his home, pursuant to a warrant. After the officers advised him of his Miranda rights, which he acknowledged he understood, and voluntarily waived, defendant gave a recorded statement in the presence of Detectives James Clark, Doug Tarver and Chuck Roark, where he related to the officers the events of the late afternoon of September 29, 2000. He claimed that once he and Mrs. Brinson went inside her kitchen to discuss when he would come back to do the yard work, an argument ensued.
A. She was just start running off about why you ain't doing the yard ... why you didn't come do the yard I say I'm not gonna do the yard late this afternoon... she said well you got your gloves. I said well I'm not gone do it... I said I came by here earlier to do the yard.
Q. Mmm-huh?

*983 A. And she called me a nigger and I said well let me just leave up out of here.
Q. How'd she say it ... I mean de ... describe to me a minute?
A. She said you nigger you need to go on and do the yard.
Q. Oh really?
A. I said well I don't grit down like that so I say my best out is just to leave. And I started walking towards the door... when I reached my hand to grab the door she got a knife and she cut my arm right by my wrist.
In his statement, defendant claimed that at when he started to leave, the victim got a knife and cut his arm near his wrist. At that point, he just "went off" and took the knife from Mrs. Brinson, and as he was standing there holding the knife, she ran up to him and impaled her chest onto the knife. Defendant showed the officers an old, healed wound on his arm, claiming that was where Mrs. Brinson had attacked him. The officers obviously did not believe that wound had been inflicted recently, but photographed it, nonetheless. Although, initially, defendant claimed that Mrs. Brinson ran herself into the knife, he finally admitted to a struggle where he accidently stabbed himself in the leg, and became so enraged that he subsequently stabbed the victim several more times. The officers also photographed the self-inflicted leg wound. Defendant admitted to washing the knife and the glass, then walking through the house, gathering items and placing them by the back door, before loading them into the victim's car. Defendant admitted to police that he acted alone in the stabbing death of Mrs. Brinson.

Mental Retardation for Purposes of Death Penalty (Atkins)
The Defendant contends that the definition of mental retardation in LSA-C.Cr.P. art. 905.5.1, requiring the onset before the age of 18, violates his Equal Protection and Due Process Rights.
In Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court held that execution of mentally retarded persons constitutes an excessive punishment, and thus violates the Eighth Amendment of the United States Constitution. This Court addressed Atkins in State v. Williams, 01-1650, p. 27 (La.11/01/02), 831 So.2d 835, 857, and directed trial courts in post-Atkins hearings:
(1) to order a pre-trial evidentiary hearing on the issue of mental retardation when the court has "reasonable grounds" to believe a defendant is mentally retarded, LSA-C.Cr. P. art. 643.
(2) to hold the hearing before a judge, not a jury.
(3) to require the defendant to prove by a preponderance of the evidence that he meets the criteria established in Louisiana's statutory definition of mental retardation, LSA-R.S.28:381 [defining retardation as "significantly sub-average general intellectual functioning existing concurrently with deficits in adaptive behavior, and manifested during the developmental period"].
In response to both Atkins and Williams, the legislature enacted 2003 La. Acts 698, which created LSA-C.Cr.P. art. 905.5.1.[3] The code article provides for a *984 procedure to be used in the event that a defendant raises a claim of mental retardation. Under the article, such a defendant has the burden of proving mental retardation *985 by a preponderance of the evidence. LSA-C.Cr.P. art. 905.5.1(C)(1). The article defines mental retardation as:
a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
LSA-C.Cr.P. art. 905.5.1(H)(1).
The article concludes with an advisory list of several medical conditions which do not necessarily constitute mental retardation. LSA-C.Cr.P. art. 905.5.1(H)(2). Included on the list are mental illness, organic brain damage occurring after age 18, learning disabilities, speech and language disorders, and personality disorders. In Atkins, the United States Supreme Court also suggested factors to consider for the determination of mental retardation:
Clinical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

Atkins, 536 U.S. at 318, 122 S.Ct. at 2250-51.
In the instant case, the Defendant contends that the preponderance of the evidence in the record demonstrates that he suffers from mental retardation, and that his execution by the state would constitute cruel and unusual punishment. During pre-trial motions hearings, the defense filed a notice of intent to claim mental retardation, and subsequently, filed a memorandum in support in which the defense sought to declare Louisiana's definition of mental retardation unconstitutional because LSA-C.Cr.P. art. 905.5.1 requires the onset of retardation to occur before age 18. The State filed a memorandum in opposition. The trial court conducted a hearing and subsequently denied defendant's motion to declare LSA-C.Cr.P. art. 905.5.1 unconstitutional. The defense objected and gave notice of its intent to seek writs. The court of appeal denied defendant's writ and affirmed the trial court's ruling upholding, making the following observation:
The defense seeks a judicial declaration that LSA-C.Cr.P. art. 905.5.1 relating to the capital sentencing of persons who are mentally retarded is unconstitutional "because it fails to take into consideration that a person can suffer a disability characterized by significant limitations in intellectual function and adaptive behavior after the age of eighteen." The defense is asking this court to extend the holding in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d [335] (2002), and to redefine mental retardation as used in that case. We decline to so rule at this time. We find no error in the district court's judgment.
*986 State v. Anderson, 39,232 (La.App.2d Cir.7/29/04).
For whatever reason, the defense did not file a writ application with this Court. Nevertheless, at the penalty phase, the defense argued that defendant's mental retardation was a complete bar to the death penalty, not merely a mitigating circumstance.[4]
Here, appellate counsel reiterates the argument that LSA-C.Cr.P. art. 905.5.1 deprives an individual of his basic right to life by excluding him from exemption from the death penalty based solely on the age of onset of his symptoms of mental retardation, and that such a deprivation violates defendant's rights under the Equal Protection Clause and cannot survive strict scrutiny.
In State v. Turner, 05-2425(La.7/10/06), 936 So.2d 89, this Court upheld the constitutionality of LSA-C.Cr.P. art. 905.5.1 and upheld the statute's provision that a jury serve as the factfinder on the question of mental retardation during a capital sentencing hearing. Although the "onset by age eighteen" provision was not at issue in Turner, the Court did note generally that "a statute is presumed to be valid and its constitutionality should be upheld whenever possible." Turner, 05-2425, at 4, 936 So.2d at 94. Moreover, the provision that the onset of mental retardation manifest by age 18 comports with Atkins, the American Association of Mental Retardation (AAMR), see AAMR, Mental Retardation, p. 1 (10th ed.2002), the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), see DSM-IV, p. 41 (2000), and the definitions provided for by most of the states that have statutes prohibiting execution of the mentally retarded.
However, as reflected by defendant's argument, the incorporation of a clinical diagnostic profile into Eighth Amendment jurisprudence illustrates the cautionary note sounded by the American Psychiatric Association, that "[w]hen the DSM-IV categories, criteria, and textual descriptions *987 are employed for forensic purposes, there are significant risks that diagnostic information will be misused or misunderstood." DSM-IV, pp. xxxii-iii. The onset age of 18 represents an essential feature of the diagnosis because mental retardation belongs to a set of disorders "that are usually first diagnosed in infancy, childhood, or adolescence... [a]lthough ... the disorders sometimes are not diagnosed until adulthood." DSM-IV, p. 39. By its clinical definition, mental retardation is a developmental disorder in the sense that "the predominant disturbance is in the acquisition of cognitive, language, motor, or social skills." DSM-III, p. 28 (1990). Pertinent to defendant's equal protection arguments are the following observations in DSM-III (not carried forward in DSM-IV):
By definition, Mental Retardation requires that onset be before age 18. When a similar clinical picture develops for the first time after the age of 18, the syndrome is a Dementia, not Mental Retardation, and is coded within the Organic Mental Disorders section of the classification. An example would be a 19-year-old with previously normal intelligence who developed the clinical picture of Mental Retardation after sustaining brain damage in an automobile accident. However, a Dementia can be superimposed on previously existing Mental Retardation. An example would be a child with mild Mental Retardation whose functioning deteriorates after sustaining brain damage in an automobile accident. When the clinical picture develops before the age of 18 in a person who previously had normal intelligence, Mental Retardation and Dementia should both be diagnosed. DSM-III, p. 29.
Louisiana's statute reflects these distinctions. The various disorders enumerated in LSA-C.Cr.P. art. 905.5.1(H)(2) which do not "necessarily constitute mental retardation" do not, as counsel suggests, create a separate class of disorders free of the onset age requirement. Consistent with the observations in DSM-III, they may lead to a diagnosis of mental retardation if they occur before the age of 18. Nevertheless, while these distinctions appear entirely consistent within the frame work of a clinical diagnosis, they can appear arbitrary when applied in a legal context, which should require a principled basis for distinguishing between the 19-year who has marked IQ deficiency, and clear adaptive skills impairment as the result of organic brain damage sustained in an automobile accident and the 17-year old who has marked IQ and adaptive skills deficiencies as the result of genetic makeup or ingestion of lead paint (as in the case of Corey Williams, see State v. Williams, 01-1650 (La. 11/01/02), 831 So.2d 835).
The United States Supreme Court has made clear that mental retardation is not "a quasi-suspect classification calling for a more exacting standard of judicial review than is normally accorded economic and social legislation." City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 442, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). Although the class of mentally retarded persons is scarcely homogenous and encompasses "those whose disability is not immediately evidence to those who must be constantly cared for ...," Id., 473 U.S. at 442, 105 S.Ct. at 3255-56, this "large and diversified group," Id., can be defined as a class of developmentally disadvantaged persons for whom a legislature may accord different and special treatment if it has a rational basis for doing so. On the other hand, the group of persons who function at the same mental and adaptive level as the result of other clinical disorders (including dementia caused by traumatic organic brain damage) not related to developmental disadvantages *988 is far more diffuse and much harder to define, and includes those persons who have lost cognitive, language, motor, or social skills, as opposed to those persons who failed to acquire those same skill at an appropriate age. A legislature may rationally treat the two classes differently for purposes of deciding who is and who is not exempt from capital punishment, according special treatment to mentally retarded persons because of the developmental nature of their disorder, while according those in the latter category the opportunity of demonstrating specifically why their disorders mitigate the moral culpability of their act. Cf. LSA-C.Cr.P. art. 905.5(e) (mitigating circumstance that at the time of the offense "the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease of defect or intoxication").
Any rational system of classification may produce seemingly arbitrary anomalies. A normal 16-year-old who suffers traumatic brain damage in an automobile accident may receive a diagnosis of mental retardation while a normal 18-year-old who suffers the same damage in a similar manner may not, although the degree of impairment in intellectual functioning and adaptive skills may be identical in both instances.

Trial evidence of defendant's mental retardation
"`Mild' mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70." Atkins, 536 U.S. at 309 n. 3, 122 S.Ct. at 2245(quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, pp. 42-43 (4th ed.2000)).
The jury learned of defendant's purported mental retardation at the sentencing phase through the testimony of defense expert, Dr. E.H. Baker, a licensed psychologist practicing in Monroe, Louisiana. Dr. Baker evaluated defendant using a battery of tests, including the Wechsler Adult Intelligence Scale, Third Edition (WAIS-III), and the Wechsler Memory Scale, Third Edition; the Minnesota Mult-Phasic Personality Inventory, Second Edition (MMPI-2). In making his assessment, Dr. Baker also reviewed a physical exam performed on defendant by Dr. Bruce Wheeler dated April 3, 2005 and another dated September 13, 1995. In addition, Dr. Baker reviewed medical records from October 1994 from Greer Neurosurgery Clinic, and various medical records from Glenwood Regional Medical Center. Dr. Baker looked at a psychological memo provided by Dr. Frederick Salter dated June 29, 2004, as well as defendant's school records from Monroe City Schools. Finally, Dr. Baker reviewed the psychiatric reports of the sanity commission doctors appointed in this case, Dr. Frank Weinholt, whose report is dated August 21, 2001, and Dr. George Seiden, whose report is dated March 19, 2001.
Dr. Baker explained that the WAIS-III tests cognitive or intellectual functioning, and from that test, he obtained an IQ score for defendant. According to his findings, "[t]he full scale score came out in the borderline range of intellectual functioning and that's borderline mental retardation." When asked if defendant is mentally retarded, Dr. Baker disclosed:
He fits in the definition of the AAMR definition of mental retardation. The fact that his full scale score was a 73 puts him on the point score being in the borderline range.
Dr. Baker further broke down defendant's IQ score into its component elements, indicating that defendant's "verbal side came out to be a 68" which suggested that defendant was functioning in the mild *989 mentally retarded range as to his verbal skills. On the other hand, with respect to his perceptual organization, defendant scored 78, indicating that he "functions better if he's doing hands-on stuff." Dr. Baker interpreted defendant's scores to mean that: "He is going to be able to look at something and reason and problem solve that better just by piecing it together than he is by listening to things.... So he could work on equipment, for instance, and do stuff like that much better than he can deal with people in talking with them."
Defendant's memory was not impaired at all and he scored in the low normal range insofar as his ability to recall information. However, the MMPI results suggested to Dr. Baker that defendant has a lot of mental confusion, which may be attributable to a psychotic disorder. Dr. Baker also concluded that defendant's confusion was partly a product of his alcohol and cocaine dependence, both of which would be in remission because of his incarceration. Dr. Baker referred to defendant's "K scale" of the Wiggins Social Desirability Scale on which defendant's score for defensiveness could be interpreted as an inability to deal with stress. Moreover, the MMPI suggested some anti-social features to defendant's personality, which Dr. Baker would not rate as rising to the level of a full-blown personality disorder, but nevertheless, exhibiting some traits of anti-social behavior.
However, Dr. Baker was constrained to acknowledge that as to the "variable response inconsistency scale," the so-called "lie scale," or "F scale," those results were elevated, suggesting that defendant was exaggerating. Dr. Baker admitted that defendant's "validity scores" were "quite unusual," although Dr. Baker soft-pedaled the scores by attributing them to defendant putting forth an effort at "attempting not to look crazy." Yet, Dr. Baker contradicted that assessment when he disclosed that defendant's "T score" was an "89 which says he was exaggerating. He was definitely trying to look bad because those are items that even people who are hospitalized don't generally endorse. But when I look also at the lie scale and it's elevated, then yes, I think he was lying but I think he doesn't know how to go about lying properly."
Notwithstanding the overt suspicion that malingering tainted defendant's scores, derived from testing performed a mere five days before jury selection of his capital trial began, his full scale score of 73 falls within a possible margin of error of four points that could place his actual IQ below 70, the line demarcating mild mental retardation. See Williams, 01-1650 pp. 23-24, n. 26, 831 So.2d at 853-54 ("Thus, an IQ of 70 could range from 66 to 74 assuming an SEM [standard error of measurement] of 4.").
On cross-examination, the prosecutor suggested that the numerous times defendant had repeated grades did not necessarily indicate borderline functioning abilities, and reminded Dr. Baker that there was evidence that defendant missed one year of school as a child because of rheumatic fever, and defendant also had to repeat grades because of excessive absenteeism.

State's rebuttal case: Dr. George Seiden
Following defendant's penalty phase of the case in which he claimed mental retardation as a complete bar to the death penalty, the State called in rebuttal Dr. George Seiden, whom the trial court accepted as an expert in psychiatry and forensic psychiatry. Dr. Seiden testified that he had interviewed defendant and reviewed the same reports and medical records reviewed by the defense expert, Dr. Baker, as well as Dr. Baker's test results and report. Dr. Seiden testified that the *990 head injury defendant sustained in 1994 did not result in any mental capacity dysfunction, nor did defendant suffer from any post-traumatic stress disorder as a result of that beating. Dr. Seiden observed that the CT scans of defendant's brain following that injury revealed that defendant experienced bleeding in the tentorium cerebelli, which is the area of the brain that is involved primarily in balance and coordination, with some role in memory. Dr. Seiden stressed that the area of defendant's brain injury did not involve executive functioning or impulse control that would be the frontal cortexwhich showed no injury in defendant's medical records.
Dr. Seiden testified that, upon his review of defendant's IQ test results, he did not find defendant mentally retarded. Defendant's full scale IQ of 73 is not recognized within the range for mild mental retardation (55-70). An IQ of 73 is in the range of borderline intellectual functioning which is above mild mental retardation. Dr. Seiden explained that the measure of IQ can be affected by all sorts of things, for example, if someone takes an IQ test when they are sick, the test score will probably be lower. Similarly, if the person being tested is depressed, the IQ could be 10 to 15 points lower than when that individual is not depressed.
Dr. Seiden also addressed the validity components of defendant's MMPI test as presented on the three validity indicators, the L, F, and K scales. According to Dr. Seiden, the "larger the difference between the F scale and the K scale, the greater the likelihood that the person is exaggerating the extent of their disturbance." The MMPI is a test of 567 true/false questions, computer-scored. Of the 10 clinical scales tested by the MMPI, the computer breaks out the scores into "obvious versus subtle" in five of those scales. Dr. Seiden gave the example that some test questions asked clearly relate to depression as to which "anyone taking the test will be able to know that has something to do with depression. But there are going to be other questions in there that the general public doesn't know [have] something to do with depression. Consequently, when there is a big difference between the obvious scores and the subtle scores, that is an indication of exaggeration." Dr. Seiden noted that on defendant's MMPI, his depression scale showed an obvious score of 76, and a subtle score of only 48. Dr. Seiden found that to be a significant disparity, and elaborated:
[T]here is a pretty big range in between them. What's called the hysteria scale which measures certain physical complaints, emotional ability, dramatic presentations, those kinds of things. His obvious score is 103, almost off the scale. His subtle score is 43, actually in the low end of normal, big, big difference. In every one of the scales where there is an obvious versus the subtle, his obvious is significantly higher. Four (4) out of the five (5) [scales on defendant's MMPI] is significantly higher, there's one, the mania scale where there's only a 7 point difference. So he's not trying to show himself as having energy but in the other four (4) scales, big differences between obvious and subtle. Another indication of exaggeration on his presentation.
Dr. Seiden further opined that defendant does not meet the Louisiana definition of mental retardation, because he was never diagnosed as mentally retarded before age 18. Moreover, even assuming that defendant's 1994 brain injury, impacted his IQ, that would mean that before the injury (which occurred when defendant was age 32), his IQ would have been even higher. Thus, "it's impossible that prior to *991 the age of 18, he would have had an IQ that would have been in the range of mental retardation."
Moreover, the jury heard defendant's own account of his actions after the murder, where he washed the blood from the drinking glass and the knife he used to kill Mrs. Brinson, and he disabled the kitchen telephone. Such organized behavior to cover his tracks, suggests a level of intellectual awareness of right from wrong, and could have formed the basis for the jury to determine that defendant's adaptive skills were not retarded. Furthermore, two experts, one for the defense and one for the state, testified that defendant's 1994 traumatic brain injury did not result in brain damage. Dr. Wheeler and Dr. Seiden opined that the 1994 head injury did not result in any mental capacity dysfunction.
Under these circumstances, appellate counsel's argument that defendant qualifies as mentally retarded due to the traumatic brain injury is without merit. Likewise, counsel's argument that Louisiana's definition violates the defendant's Equal Protection rights because it arbitrarily sets the age of 18 as the onset requirement is rendered moot without any evidence whatsoever that the 1994 head injury caused defendant to have, so-called, adult-onset mental retardation. Defendant's school records do not support defendant's contention of mental retardation and his test scores, as fully presented to the jury, were similarly unpersuasive because of substantial questions raised about malingering. Consequently, the jury decided that defendant did not carry his burden of proof to establish by preponderance of evidence that he suffered from mental retardation to render him exempt from capital punishment under Atkins. LSA-C.Cr.P. art. 905.5.1. Thus, by its unanimous verdict, defendant's jury found that he was not mentally retarded. Defendant's contentions of mental retardation are without merit.

Competency to Stand Trial
In this assignment of error, the defense contends that the trial court abused its discretion by concluding that he was competent to proceed to trial. Appellate counsel suggests that the trial court not only erred by finding defendant competent to proceed following the November 29, 2001 sanity hearing, but also erred by failing to re-examine defendant in the four intervening years between his evaluation by the sanity commissioners and the trial. The examination of the defense psychologist, Dr. E.H. Baker, was conducted on April 6, 2005, i.e., five days before jury selection. Dr. Baker suggested that defendant was "experiencing moderate to severe emotional distress characterized by fearfulness, hopelessness, and dysphoria... and may be, in fact, losing his mind."
In State v. Carmouche, 01-0405, pp. 29-31(La.05/14/02), 872 So.2d 1020, 1041-1042, this Court set forth the legal standard for determining whether a criminal defendant is competent to stand trial as follows:
A criminal defendant has a constitutional right not to be tried while legally incompetent. Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, 365-66 (1992) (quoting Drope v. Missouri, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975)). A state must observe procedures adequate to protect a defendant's right not to be tried while incompetent, and its failure to do so deprives the defendant of his due process right to a fair trial. Id. (quoting Drope, 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113); Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966).

*992 Louisiana's statutory scheme for detecting mental incapacity jealously guards a defendant's right to a fair trial. [State v.] Nomey, 613 So.2d [157] at 161 [(La. 1993)] (quoting State v. Rogers, 419 So.2d 840, 843 (La.1982)). In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." LSA-C.Cr.P. art. 641; see also Nomey, 613 So.2d at 161. Our law also imposes a legal presumption that a defendant is sane and competent to proceed. LSAR.S. 15:432; State v. Bridgewater, 00-1529, p. 6 (La.1/15/02), 823 So.2d 877, 888; [State v.] Martin[, 00-0489,]at p. 1 [(9/22/00)], 769 So.2d [1168] at 1169; State v. Armstrong, 94-2950, p. 4 (La.4/8/96), 671 So.2d 307, 309; State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32. Accordingly, the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial. State v. Frank, 96-1136, p. 1 (La.10/4/96), 679 So.2d 1365, 1366 (citing Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)); Armstrong at p. 4, 671 So.2d at 309; [State v.] Silman[, 95-0154], at p. 7 [(La.11/27/95)] 663 So.2d [27] at 32. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. Bridgewater at p. 6, 823 So.2d at 888; Martin at p. 1, 769 So.2d at 1169. Specifically, the appointment of a sanity commission is not a perfunctory matter, a ministerial duty of the trial court, or a matter of right. Martin at p. 1, 769 So.2d at 1169; State v. Nix, 327 So.2d 301, 323 La. 1975). It is not guaranteed to every defendant in every case, but is one of those matters committed to the sound discretion of the court. Martin at p. 1, 769 So.2d at 1169; Wilkerson, 403 So.2d at 658; Nix, 327 So.2d at 323. The Louisiana Code of Criminal Procedure provides that a court shall order a mental examination of a defendant and accordingly appoint a sanity commission when it "has reasonable ground to doubt the defendant's mental capacity to proceed." LSA-C.Cr.P. art. 643. Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. State v. Snyder, 98-1078, p. 24 (La.4/14/99), 750 So.2d 832, 851 (quoting Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980)). In the exercise of its discretion, the court may consider both lay and expert testimony before deciding whether reasonable grounds exist for doubting the defendant's capacity to proceed and ruling on the defendant's motion to appoint a sanity commission. Martin at p. 2, 769 So.2d at 1169; Silman at p. 7, 663 So.2d at 32.
In evaluating the legal capacity of the criminally accused, we have stated that the consideration in determining whether the defendant is fully aware of the nature of the proceeding include:
Whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and consequences of *993 conviction. State v. Bennett, 345 So.2d 1129, 1138(La.1977).
This Court has stated that the facts to consider in determining the defendant's ability to assist in his defense include:
Whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of the witnesses and inform his lawyer of any distortions or misstatements, whether he has the ability to make simple decisions in response to well-explained alternative; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial; see also State v. Snyder, 98-1078, p. 5 (La.4/14/04), 874 So.2d 739, 742.
Here, defendant placed the issue of his sanity before the court only once, by filing an application for appointment of a sanity commission on December 15, 2000. Although the defense motion only made general reference to a "mental disease or defect," the court held a hearing on January 10, 2001 at which time defendant's sister, Vera Gibson Walker, testified on defendant's behalf. Walker related to the court the circumstances of defendant's 1994 beating, and its impact on his mental capacity, from her observation. At the conclusion of that hearing, the defense introduced defendant's 1994 medical records from Glenwood Regional Medical Center, and the trial court ordered a sanity commission to examine defendant. The court appointed Dr. George Seiden and Dr. Frank Weinholt to the sanity commission.
Dr. Seiden's report dated March 19, 2001 establishes that, in his opinion, defendant "has the ability to consult with his attorney with a reasonable degree of rational understanding and currently has a rational and factual understanding of the proceedings against him." Dr. Seiden further elaborated that defendant met all of the Bennett criteria.
Dr. Weinholt's report is dated August 21, 2001, but apparently was not filed with the trial court until November 7, 2001. Dr. Weinholt found "no suggestion that [defendant's] previous head concussion has resulted in any loss of ability to assist his attorney presently. His review of past legal problems confirms he has a good working knowledge of the legal system and how it works." In addition, Dr. Weinholt concluded that defendant understood right from wrong at the time of the offense.
On November 29, 2001, the trial court held a sanity hearing, and proceeded on the question of competency based on the reports of the two doctors appointed. Based on his review of the findings of the sanity commission, as well as his review of the 1994 medical records introduced from Glenwood Regional Medical Center, the judge found defendant competent to stand trial. The trial court recited the Bennett criteria and found defendant capable in each regard. The judge further noted: "The doctors tell me, and that's the evidence I had to go on, that they have no reason to believe that his mental condition is apt to deteriorate under the stress of trial." Accordingly, pursuant to LSA-C.Cr.P. art. 647, the court found defendant competent to proceed to trial.
Notably, the defense voiced no objection to the trial court's finding of competence to proceed to trial. More importantly, the defense never requested that defendant be examined yet again on the question of competency. Appellate counsel *994 posits that the trial court should have been put on notice by virtue of Dr. Baker's report that defendant had an apparent sense of "losing his mind," such that it should have re-opened the sanity commission, sua sponte.
While Dr. Baker's testing of defendant occurred on April 6, 2005, Dr. Baker's report was not submitted until April 20, 2005, which would have been nine full days into jury selection of defendant's capital trial. The dilatory submission of Dr. Baker's report was a subject of some consternation among the parties and the court, and a constant subject throughout voir dire breaks. Defense counsel was regularly scolded by the judge to get his expert to submit his report. In fact, by the time Dr. Baker finally submitted his report, the trial judge had the opportunity to observe and assess, firsthand, defendant's demeanor for nine days straight under the stress of trial, and apparently detected no mental difficulties to warrant intervention. Under these circumstances, the determinations of the trial judge as to competency of defendant to stand trial are entitled to great weight on review, and will not be overturned absent an abuse of discretion. State v. Brogdon, 426 So.2d 158, 167 (La.1983); State v. Rochon, 393 So.2d 1224, 1228 (La.1981).
We find that the record supports the trial court's findings that the defendant was aware of his surroundings; the proceeding in which he was participating; and he understood the charges against him and the consequences of these charges. Thus, the record fully supports the conclusion that the defendant was competent to stand trial.

Admissibility of Statement; Waiver of Miranda Rights
In this assignment of error, defendant argues that the statement made by him occurred without a knowing and voluntary waiver of his Miranda rights, and the trial court's ruling allowing admission of this statement is error.
It is well-settled that for a confession or inculpatory statement to be admissible into evidence, the State must affirmatively show that it was freely and voluntarily given without influence of fear, duress, intimidation, menace, threats, inducements, or promises. LSA-R.S. 15:451; State v. Simmons, 443 So.2d 512 (La.1983). The State must also establish that an accused was advised of his constitutional rights, state and federal, and that he understood and knowingly waived those rights. State v. Simmons, supra.
In Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United State Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before questioning a suspect in custody, Miranda requires that law enforcement officials inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one would be appointed for him.
The admissibility of a confession is, in the first instance, a question for the trial court; its conclusions on the credibility and weight of the testimony relating to the voluntary nature of the confession are accorded great weight and will not be overturned unless they are not supported by the evidence. See State v. Jackson, 381 So.2d 485 (La.1980); State v. Patterson, 572 So.2d 1144, 1150 (La.App. 1st Cir. 1990), writ denied, 577 So.2d 11 (La.1991); State v. Sanford, 569 So.2d 147, 150 (La. App. 1st Cir.1990), writ denied, 623 So.2d 1299 (La.1993). Whether or not a showing *995 of voluntariness has been made is analyzed on a case by case basis with regard to the facts and circumstances of each case. State v. Benoit, 440 So.2d 129, 131 (La. 1983). The trial court must consider the totality of the circumstances in deciding whether a confession is admissible. State v. Hernandez, 432 So.2d 350, 352 (La.App. 1st Cir.1983).
Low intellect, moderate mental retardation or diminished mental capacity does not, per se, vitiate capacity to make a free and voluntary statement or a knowing and intelligent Miranda waiver. State v. Brooks, 93-3331, pp. 11-17(La.1/17/95), 648 So.2d 366, 373-75; State v. Benoit, 440 So.2d 129, 131 (La.1983); State v. Lindsey, 404 So.2d 466, 472 (La.1981). Voluntariness is determined on a case by case basis, under a totality of the circumstances standard. State v. Brooks, 648 So.3d at 372; State v. Benoit, 440 So.2d at 131.
In the present case, the trial court held a hearing on defendant's motion to suppress his confession. The state presented testimony from Detectives James Clark and Doug Tarver of the Monroe Police Department. Det. Clark testified that he arrested defendant on October 2, 2000 pursuant to an arrest warrant. The detectives advised defendant of his Miranda rights and had defendant follow along on a waiver of rights form. After the officers explained his rights to defendant, defendant initialed and signed the waiver form and agreed to give a voluntary taped statement, which was about one hour in duration. Defendant's statement was audiotaped, and a transcript of that interview was introduced at the motion hearing.
In the transcript of the recorded interview, Detective Clark confirmed that defendant had been advised of his rights, and re-read the rights waiver form aloud. Defendant confirmed his initials and signature on the rights waiver form. During the interview, defendant never requested an attorney. In addition, the officers provided defendant with something to eat and drink, and he was given opportunities to use the restroom, as needed. Both officers testified that defendant did not appear to be under the influence of any alcohol or other substance. Defendant assured the officers that he did not feel hungover or confused, and that he understood his rights. Moreover, both officers reiterated that they exerted no threats, promises or coercion to get defendant to give a statement.
At the hearing on the motion to suppress, the State introduced the sanity commission reports of Dr. George Seiden and Dr. Frank Weinholt as further evidence that defendant's waiver of rights was knowing, intelligent and voluntary. Following the testimony, the trial court found defendant's waiver of his rights was knowing and intelligent, free and voluntary, and denied defendant's motion to suppress.
Defendant's custodial statement appears to be the product of his voluntary waiver of his constitutional rights, which he repeatedly indicated that he fully understood. No lack of understanding or voluntariness is demonstrated, and the trial court's ruling denying defendant's motion to suppress his statement appears well-founded. This assignment of error lacks merit.

Challenge for Cause (Witherspoon v. Illinois)

The Sixth Amendment of the United States Constitution guarantees the accused the right to a trial by an impartial jury. La. Const. art. I, § 17 guarantees the right to full voir dire examination of prospective jurors and to challenge those jurors peremptorily. The number of challenges is fixed by law. This Court in State *996 v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713, 722-23, has stated:
Therefore, when a defendant uses all of his peremptory challenges, a trial judge's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. [Citations omitted].
La. Const. art. I, § 17(A) provides that a defendant has a right to challenge jurors peremptorily, with the number being fixed by law. LSA-C.Cr.P. art. 744[5] provides the defendant in a death penalty case with twelve peremptory challenges. Therefore, when a defendant uses all of his peremptory challenges, a trial judge's erroneous ruling depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. State v. Jacobs, 99-1659, p. 5 (La.6/29/01), 789 So.2d 1280, 1284; State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683, 686; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 534; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280. A defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror. LSA-C.Cr.P. art. 800.
Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and the defendant has exhausted his peremptory challenges. Cross, 93-1189 at 1192, 658 So.2d at 686; State v. Robertson, 92-2660 at 3-4, 630 So.2d at 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). Thus, "[t]o prove there has been reversible error warranting reversal of the conviction and sentence, defendant need only show (1) erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges." Id. The trial judge is vested with broad discretion in ruling on challenges for cause, and his ruling will only be reversed when review of the entire voir dire shows the trial judge abused his discretion. Robertson, 92-2660 at 2663, 630 So.2d at 1281.
The grounds for which a juror may be challenged for cause are set forth in LSA-C.Cr.P. art. 797, which sets forth in pertinent part:
LSA-C.Cr.P. art. 797. Challenge for cause
The State or the defendant may challenge a juror for cause on the ground that:
* * *
(2) The juror is not impartial, whatever the cause of his impartiality.
* * *
(4) The juror will not accept the law as given to him by the court.
The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Manning, 03-1982 p. 38 (La.10/19/04), 885 So.2d 1044, 1082, cert. denied, 544 U.S. 967, 125 S.Ct. 1745, 161 L.Ed.2d 612 (2005). Witt clarified the earlier Supreme Court pronouncement in Witherspoon v. Illinois, supra., that a prospective juror who would vote *997 automatically for a life sentence was properly excluded by the trial court. LSA-C.Cr.P. art. 798(2)(a) and (b) incorporate the standard of Witherspoon, as clarified by Witt.
It is good cause for challenge on the part of the State, but not on the part of the defendant, that
(2) The juror tendered in a capital case who has conscientious scruples against the infliction of capital punishment and makes it known:
(a) That he would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before him;
(b) That his attitude toward the death penalty would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath; ...
Applying these precepts to the responses of these prospective jurors challenged and about whom defendant now complains, the record fairly well supports the trial court's decision to deny the defense's cause challenges against the prospective jurors.
In this assignment of error, defendant argues that the trial court erroneously allowed the State's cause challenges as to two prospective jurors whose voir dire examinations revealed that they could consider imposing the death penalty under the appropriate circumstances. Defendant claims that the jurors at issue in this part expressed, at most, "mere generic queasiness" to capital punishment.
A prospective juror is properly excluded for cause because of his/her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under LSA-C.Cr.P. art. 798(2)(b), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror's views "would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." Witt, supra. Witherspoon further dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Id., 88 S.Ct. at 1777. Moreover, notwithstanding LSA-C.Cr.P. art. 800(B), which states that a defendant cannot complain of an erroneous grant of a challenge to the State "unless the effect of such a ruling is the exercise by the State of more peremptory challenges than it is entitled to by law," the United States Supreme Court has consistently held that it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is Witherspoon-eligible, despite the fact that the state could have used a peremptory challenge to strike the potential juror. Gray v. Mississippi, 481 U.S. 648, 664, 107 S.Ct. 2045, 2054, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865 (unpub. appx. at 7). To determine the correctness of rulings on cause challenges, a review of the prospective juror's voir dire as a whole must be undertaken. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108 *998 (trial judge is afforded great discretion in determining whether cause has been shown to reject a prospective juror); State v. Williams, 457 So.2d 610, 613 (La.1984); State v. Hall, 616 So.2d 664, 669 (La. 1993).
In the instant case, the state used only five of its allotted peremptory challenges during jury selection. However, as set out above, the state's failure to exhaust peremptory challenges does not preclude review of the trial court's rulings on individual Witherspoon challenges. A review of the record demonstrates that the trial judge did not abuse his discretion in granting the state's challenges for cause as to the two prospective jurors in dispute.

James Jones
Jones was questioned in Pool 1, Panel 1. When the prosecutor began the initial death-qualifying inquiries, Jones disclosed his feelings on the subject of capital punishment:
Well in my personal opinion one of the Ten Commandments is thou shall not kill.... If the defendant is guilty and he did kill, if I sentence him to death, would I ... would I be killing?
Jones conceded that those feelings might interfere with his ability to render a death verdict.
When questioned by defense counsel, Jones ranked himself as a "four" on a scale of one to ten, with one being the least favorable to the death penalty. He further admitted that he did a report on capital punishment at the age of twelve, and that he has had "mixed feelings about it with my religion ever[] since." When counsel queried whether Jones thought that innocent people may have been put to death, Jones replied: "Yes, sir. I do believe so, but I also believe there's been guilty people walk away though."
Counsel sought to rehabilitate Jones, who claimed: "I feel like I could consider both sides in making my decision." But when asked if he could vote for the death penalty, Jones expressed his true feelings: "I'm not sure. That's just a touchy subject with me. I mean I'd have to have all of the facts, but I wouldn't want to be judged for something like that." Jones confirmed his Christian beliefs as the possible source of his hesitancy in serving on a jury: "Judge not or you shall be judged."
Thereafter, the State issued a challenge for cause as to Jones, and counsel objected that Jones had expressed a willingness to consider both verdicts. However, because Jones did not indicate expressly that he could vote for both, the court decided to bring him back for individualized voir dire. The judge explained again what would be required of him, if he was chosen for this capital jury. Jones admitted that "my beliefs might interfere with my duty.... I have very ... very strong feelings about that I'll be clear about. Yes, sir." Jones reiterated that he felt strongly that he did not want to be responsible for taking someone's life. The judge then asked Jones, if the defendant were found guilty of first degree murder, would he vote his beliefs and "always vote life," thereby depriving the state from seeking the death penalty. Jones replied: "Correct. I don't think a jury could make me change my beliefs on that because I would have to live with that for the rest of my life." After the judge explained the evidence that would be presented at a possible penalty phase with an aim toward voting for the appropriate penalty, death or life, Jones observed: "I don't think that I would be fair to the state if he was convicted and found guilty."
Afterwards, the State renewed its cause challenge as to Jones, which the trial court granted with the following remarks: "[I]t's clear to me this has weighed heavily on his *999 mind. His facial expression, voice tones clearly shows the Court that his views would interfere with his willingness and ability to follow the law and that he would never be able to vote for the death penalty."
To the extent that Jones voiced such strong religious beliefs against the death penalty, and exhibited a clear aversion to sitting in judgment of his fellow man, the state was justified in challenging him for cause. LSA-C.Cr.P. art. 798(2)(b) provides that a prospective juror is properly excused when his attitude toward the death penalty would prevent, or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath. We find no error in the trial court granting the State's challenge for cause.

Jessica Hearne
Hearne was questioned in Pool 1, Panel 2. Hearne's responses to the trial court's questions on the death penalty were decidedly equivocal:
Q: Ms. Hearne, regardless of the evidence would you be unable to even consider imposing the death sentence?
A: I'm not sure.
Q: Okay. Would you automatically vote for life imprisonment regardless of what the evidence might show during the penalty phase?
A: I'm just not sure.
Q: Do you have conscientious scruples against infliction of capital punishment?
A: Against myself making the decision for someone else's life, yes.
The judge continued by explaining to Hearne that both sides want a jury that can follow the law and be fair and impartial, but that the state was looking for jurors who could vote guilty of first degree murder, and then, vote for the death penalty. When the judge asked Hearne if she could do that, she waffled: "I've never had to do that before so I can't ... I can only tell you that I ... I would not like to do that." The judge asked again:
Q: [W]hat I am asking you is, and you're the only person that knows this, when you search inside of you, can you fairly consider all of the evidence and vote for ... depending on the evidence and what you think is appropriate, for life or death. Or do you think that your feelings would interfere with you fairly doing it?
A: That's possible.
When the judge asked Ms. Hearne whether she could be fair and impartial during the penalty phase, Ms. Hearne replied, "I could try." While admitting that she had conscientious scruples against the infliction of capital punishment, Ms. Hearne suggested that this would not preclude her from ever voting for the death sentence "under any circumstances whatsoever." Hearne conceded that the determination of guilt or innocence did not bother her as much as having to decide "whether someone should live or die."
The prosecutor suggested to Hearne that this was not an extreme first degree murder"not a Jeffrey Dahmer or an Adolph Hitler. But it's your firm belief that your feelings would substantially impair you from rendering a death verdict?" Hearne replied, "That's right."
Under defense questioning, Hearne stated "It's not necessarily the death penalty itself that I have a problem with. It is my deciding that someone should or shouldn't have the death penalty.... I just don't want to be the one to mete out judgment on another person." On the defense's death penalty scale of one to ten, Hearne ranked herself as a "five." Hearne reiterated that she would not want to take part in a decision about the death penalty, and *1000 that she "would respect the other's opinions, but it wouldn't change mine.... I am strongly opposed as I stated earlier to having someone's life in my own hands.
After the state challenged Hearne for cause, defense counsel stated, "I don't wish to call her back" for further questioning. The court granted the state's cause challenge with the following observations: "Ms. Hearne told us in numerous phrases, terms and by her demeanor that sure, some people deserve it, she doesn't want to do it, she's not going to do it. And this court is convinced that in any case she sat on, she would never impose the death penalty." LSA-C.Cr.P. art. 798(2)(b) supports the State's challenge as to Hearne. Nothing presented by defendant persuades this Court that the judge abused his discretion in granting the state's cause challenge as to Hearne.

Challenges for Cause-Pro-death jurors

(Reverse-Witherspoon)
In this part, defendant complains that the trial court erroneously denied his challenges for cause as to three prospective jurors whose voir dire examinations revealed that they would not genuinely consider a life sentence. In defendant's view, the court's rulings resulted in a death-prone jury.
In a "reverseWitherspoon" situation, the basis of the exclusion is that a prospective juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him...". Robertson, 1992-2660 p. 8, 630 So.2d at 1284. The "substantial impairment" standard applies equally to "reverseWitherspoon" challenges. Manning, XXXX-XXXX at 38 n. 22, 885 So.2d at 1083 n. 22. Thus, if a potential juror's views on the death penalty are such that they would prevent or substantially impair the performance of his duties in accordance with his instructions or oaths, whether those views are for or against the death penalty, he should be excused for cause.

Thomas Hutson
Defendant avers that Hutson, who believed in an "eye for an eye," would automatically vote for death in a case of premeditated murder. A review of the voir dire record as a whole reveals that Hutson was questioned in Pool 2, Panel 2, and his responses to both the judge and the prosecutor were balanced and fair. While he admitted in response to one of the prosecutor's inquiries that he believed in the concept of an "eye for an eye," when the state asked where Hutson fell on the death penalty continuum: "strong advocate," "a weak advocate," or "somewhere in the middle." Hutson placed himself in the middle. He assured the state that he would consider all of the mitigating evidence before making a sentencing decision.
When defense counsel asked Hutson to elaborate on his view of the death penalty, Hutson suggested: "If a person has committed a serious crime such as murder and is guilty beyond that total shadow of a doubt, then I think he should be sentenced to death." Counsel then asked Hutson if he thought mitigating circumstances should allow a person convicted of premeditated murder to escape the death penalty, and Hutson replied, "[d]epending on what they actually were." At this point, counsel gave Hutson a convoluted hypothetical involving a "lying in wait" type of murder, and then asked if Hutson thought mitigating circumstances should apply to such a case. Hutson's reply was no. Thereafter, counsel reworded his question, and Hutson indicated that he could consider mitigation evidence. Finally, after counsel asked multiple questions without giving Hutson a chance to respond on the subject of whether he would consider mitigation, a befuddled Hutson replied: "I'm not real sure *1001 how to answer that. No, I would still like to see what the circumstances behind it was before I actually made up my mind confirming it. Hutson did not waver from his opinion stating that mitigation would still be needed for consideration even in a case of premeditated murder. Further, Hutson reiterated that "there are some circumstances I wouldn't vote for death."
The trial judge denied defense counsel's challenge for cause as to Hutson, with the following observations:
The Court observed his entire testimony and observed his facial expressions and his voice tones. He's a very soft-spoken person.... I wrote a bunch of [notes]. He said to my questions in particular that he could consider both aggravating and mitigating circumstances and that he could consider both life or death. Now in your hypo, and he came back and cleared that up, based on that hypo and only on that hypo with no other evidence and no other mitigating or aggravating evidence, that he would impose the death penalty, but even then he'd put up a stronger burden on the state than they're required. The state is only required to prove beyond a reasonable doubt and not beyond a shadow of a doubt. And so even then he put a stronger burden on [the state] before he would impose death.... [H]is answers taken as a whole shows me that he's a very thoughtful person, that he will listen to both sides, and that based on the facts of the case ... he'll consider both mitigating and aggravating circumstances, he'll consider both the death penalty and life imprisonment, whether it be premeditated or not, and that there are some situations where he will give life and there are some situations where he'll give death depending upon the facts of the case.
Based on our review of Hutson's voir dire responses as a whole, and the trial court's candid assessment of his demeanor, no abuse of discretion is apparent in the court's denial of this challenge for cause. See Lee, 93-2810 at 9, 637 So.2d at 108 (A trial judge is accorded broad discretion in ruling on cause challenges because he or she "has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the parties' attorneys."). Since jury selection was completed before Hudson's name was called for further questioning, the defense was not required to use one of its peremptory challenges to excuse Hutson, and thereby waived any complaint about the trial court's ruling.

Rodney Traweek
Defendant complains that the trial court denied his cause challenge as to Rodney Traweek, who in defendant's view, would not "genuinely consider life imprisonment." A review of the record reveals that Traweek was questioned in Pool 1, Panel 4. Traweek's voir dire responses to the judge demonstrated an even-handed approach to capital punishment. Likewise, Traweek indicated that he would "not necessarily" vote death automatically.
In response to defense counsel's questions, Traweek ranked himself as a "seven" on a scale of one to ten scale, with ten being most strongly in favor of the death penalty. When asked his opinion of retardation as a mitigating circumstance, Traweek responded:
If it's proven evidence that is an issue in a case, I would consider it. Now I would have to feel one hundred percent with the evidence that I heard to change my mind against the death penalty. I guess to put it easier I'd say it may go from a seven to about a four or a five.
*1002 When counsel broached the subject of whether the prospective jurors' religious beliefs impacted their views on capital punishment, Traweek indicated that he ascribes to the biblical "eye for an eye." Counsel asked whether Traweek extended that belief to a "life for a life," yielding the following personal perspective:
In some cases I would believe that. I will say this. If I was sitting here and I was convicted of first degree murder, it would be better for me and my family for me to be sentenced to death because I wouldn't want my kids and my family to see me in prison the rest of my life.
Traweek clarified for counsel that his religious convictions did "not necessarily" dictate to him that the only appropriate response for murder would be to take the life of the perpetrator:
There may be some situations that may have caused him to prevent that death or murder that I'd have to listen to and say had this not been the situation, it may not have happened. I'd just have to listen to all of the evidence. I'm about a seven, which means there's still some doubt or some ... something in me that might say the best punishment for him is the life imprisonment. The bottom line is to punish him. What would be the best punishment? If it's death, then it's death. If it's life imprisonment, to me it'd be life in prison.... [A]fter I heard all of the evidence from both sides, then I would decide. Could I give a man the life sentence. Yes. Could I see him in ... I mean the death sentence? Absolutely. Could I see him go to prison for life. Yes.
Traweek reiterated that if he were on trial for capital murder, "I wouldn't want to spend the rest of my life in prison. That would be the biggest punishment to me."
Counsel based his cause challenge as to Traweek on the following grounds:
Although he for the most part gave right answers, when he got to the part regarding his belief in an eye for an eye and a tooth for a tooth he got very forceful."
The court denied the challenge, basing that ruling on stated reasons, including:
I find that he is a very strong-minded person ... [who] appears to be equal to giving life or death. With him he considers life imprisonment even worse of a punishment. But he said unequivocally to me and to Mr. Ruddick that he would listen and consider all of the mitigating factors and would be able in some cases [to] give a life sentence. And then if the situation warranted the death sentence, he would impose the death sentence.
Nothing in Traweek's voir dire as a whole suggests a leaning toward automatically imposing the death penalty. Accordingly, no abuse of discretion is apparent, and the trial judge properly denied the defense challenge for cause as to Traweek.
Neither the State nor the defense challenged Traweek peremptorily. However, defense counsel subsequently issued a peremptory backstrike to remove Traweek.

Kari Ellis
Defendant argues that Kari Ellis should have been struck for cause based on her predisposition in favor of the death penalty. A review of the record reveals that while Ellis was questioned in Pool 2, Panel 4. While Ellis's answers to the judge and the prosecutor reflected a neutral position regarding capital punishment, under defense questioning, Ellis disclosed the sentiments for which counsel sought to remove her:
I have always been for the death penalty and I am probably more convinced that it is more of the way to go in some *1003 instances than maybe what I was whenever I was younger and a little bit more naive to what goes on.
Ellis conceded that she is "probably a little bit colder than what [she] used to be." In Ellis's view, "the world is not necessarily a nice place to live anymore." Ellis attributed her evolution on the subject of capital punishment:
I live in the real world. I see  you know, I read the paper, see the news much more than I did whenever I was younger. When I was younger I was much more naive and much more sheltered than what I am now that I'm out on my own and know what goes on in the world.
Ellis suggested that she while she has always favored the death penalty, she probably favored it a bit more than she did as a younger person, which appears to be what she was trying to tell counsel when she ranked herself as "about a seven" on a scale of one to ten in which ten would most strongly favor capital punishment. She added that the "mitigating factors would have to be very high before I would go with life over death."
Thereafter, defense counsel challenged Ellis for cause based on her strong views "in favor of the death penalty," and that mitigating circumstances would have to be "very, very strong for her to consider life." Counsel assessed that Ellis was "not a person that could keep an open mind regarding the penalty until she heard everything because ... she would already be in favor of death when she started the penalty phase."
The trial court disagreed and denied the challenge for cause for the following reasons:
I think Ms. Ellis was straightforward. If you looked at her earlier testimony about the media and everything else she tried to let us know what was inside her, she did not keep anything back, and she tried to answer the questions truthfully as the best she understood them. I have down here she's ... strong spoken but polite and has it all together, meaning that she can articulate herself well and her feelings. Here she clearly told me, after I explained it, she could follow the law and she could obey the Court's instructions, she could consider all of the mitigating factors and that she could vote for death or she could vote for life. And she committed to me, and I believed her, that she would not make a decision until she's heard all of the evidence.... Her testimony demonstrates to me that she has a willingness and ability to decide the case impartially and according to the law and the evidence and that her inclinations would not impair her at all.
That a juror has personal predispositions towards the death penalty does not render her unfit for service on a capital jury if she is nevertheless willing to consider both aggravating and mitigating circumstances in reaching a sentencing verdict on the basis of the evidence presented at trial. State v. Higgins, 03-1980, pp. 30-31 (La.4/1/05), 898 So.2d 1219, 1238; State v. Lucky, 96-1687, pp. 7-8 (La.4/13/99), 755 So.2d 845, 850. That being the case, no abuse of discretion is apparent in the trial court's denial of the challenge for cause as to Ellis.
Ellis' name was never called for questioning in any of the subsequent rounds of general voir dire before completion of the jury panel. Accordingly, the defense did not have to use one of its peremptory challenges to excuse Ellis, and thereby waived on appeal any complaint about the trial court's ruling.

*1004 Batson Challenges

In this assignment of error, defendant contends that the trial court erred in finding that the defense failed to establish a prima facie case of discriminatory use of peremptory challenges by the State against three qualified African-American prospective jurors in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, defendant points to three peremptory challenges exercised by the state against African-American jurors: James Chapple, Umeka Hudson, and Percy Manning. The defense argues that because the State did not attempt to exclude any of these three jurors through cause challenges, the only apparent reason for challenging them peremptorily was their racial identity.
In Batson, the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. The Supreme Court reaffirmed its position that racial discrimination by any state in jury selection offends the Equal Protection clause of the 14th Amendment in Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Louisiana law codifies the Batson ruling in LSA-C.Cr.P. art. 795.[6]See also State v. Snyder, XXXX-XXXX (La.9/6/06), 942 So.2d 484, rev'd on other grounds, Snyder v. Louisiana, ___ U.S. ___, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008).
If the defendant makes a prima facie showing of discriminatory strikes, the burden shifts to the state to offer racially-neutral explanations for the challenged members. If the race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the defendant has proven purposeful discrimination. The race-neutral explanation need not be persuasive or even plausible. Rice v. Collins, 546 U.S. 333, 126 S.Ct. 969, 973-974, 163 L.Ed.2d 824 (2006), quoting Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). It will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The ultimate burden of persuasion as to racial motivation rests with, and never shifts from, the opponent of the peremptory challenge. State v. Tyler, 97-0338, at 3 (La.9/9/98), 723 So.2d 939, 942, cert. denied, 526 U.S. 1073, 119 S.Ct. 1472, 143 L.Ed.2d 556 (1999).
The trial court's findings with regard to a Batson challenge are entitled to great deference on appeal. Id. at 4; see also, State v. Juniors, 03-2425, p. 28 (La.6/29/05), 915 So.2d 291, 316. When a defendant voices a Batson objection to the State's exercise of a peremptory challenge, the finding of the absence of discriminatory intent depends upon whether the trial court finds the prosecutor's race-neutral explanations to be credible. "Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." Miller-El, 537 U.S. at 339, 123 S.Ct. at 1040.
*1005 The three-step Batson process which guides the courts' examination of peremptory challenges for constitutional infirmities has recently been described again by the Supreme Court as follows:
A defendant's Batson challenge to a peremptory strike requires a three-step inquiry. First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge on the basis of race. Second, if the showing is made, the burden shifts to the prosecutor to present a race-neutral explanation for striking the juror in question. Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices. Third, the court must then determine whether the defendant has carried his burden of proving purposeful discrimination. This final step involves evaluating the persuasiveness of the justification proffered by the prosecutor, but the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Internal quotations and citations omitted.]
Collins, 546 U.S. at 338, 126 S.Ct. at 973-74.
Ultimately, the jury seated in the instant case was composed as follows: nine white jurors, three black jurors; nine females and three males. The three alternate jurors were all white females. The defendant contends that the trial court erred in finding that the defense failed to establish a prima facie case of discriminatory use of peremptory challenges by the state against three qualified African-American prospective jurors in violation of Batson. Specifically, defendant points to three peremptory challenges exercised by the state against African-American jurors: James Chapple, Umeka Hudson, and Percy Manning.
Chapple was questioned in Pool 1, Panel 3. R., Vol. IV, p. 817. A review of his responses suggest possible race-neutral reasons for the state's peremptory challenge, although never articulated as such by the state. For example, Chapple indicated that he had previously served on a criminal jury in a second degree murder case, but the case "settled [ ] before it really got started." He expressed no moral, personal, or religious impediments to capital punishment. Chapple disclosed that a friend of his from his school years had been murdered, but that event did not affect his opinion on the death penalty. In addition, Chapple disclosed to defense counsel that his cousin's son is mentally retarded. He subscribed to the concepts of mercy and redemption. Neither the state nor the defense challenged Chapple for cause. Thereafter, the state exercised a peremptory backstrike to excuse Chapple.
Umeka Hudson, age 26, was questioned in Pool 1, Panel 1. A review of Hudson's voir dire responses reveal possible race-neutral reasons upon which the state could have relied, although it was never called upon for such an articulation. For example, Hudson initially ranked herself as a "nine" on the defense's scale, with ten being most in favor of capital punishment. However, her next response indicated that she had never given any thought whatsoever to capital punishment before "[r]ight now." She felt that there "possibly" had been executions where people who were not guilty were put to death. After the preliminary round of questioning, neither the state, nor the defense challenged Hudson for cause. Likewise, after general voir dire, neither the state nor the defense *1006 issued a cause challenge as to Hudson. Thereafter, the state exercised a peremptory strike to remove Hudson.
Although appellate counsel lists three African-American jurors in contention in the Batson portion of the appellate brief, in fact, at trial, the defense withdrew any objection pertaining to Manning. Notwithstanding trial counsel's withdrawal of his Batson objection with respect to Manning, appellate counsel took the position that "the court's specific ruling on the strike against Mr. Manning effectively rendered moot the issue of whether the defense's Batson objection included Mr. Manning." In addition, legitimate, verifiable, race-neutral reasons support the state's peremptory strike, foremost being that Manning admittedly socialized with one of the trial's defense attorneys, Louis Scott. Early on in the initial voir dire, Manning disclosed their acquaintance: "Mr. Scott, I know him. We frequent the same jazz club. And I'm thinking it may ... might cause a conflict of interest because I know him." In addition, Manning had confirmed that he had previous information about the facts of the case that he had gleaned from within the community, which he summarized as follows:
That someone is dead. A lady. A white lady. Okay. And the alleged defendant was picked up for that murder.... And the reason why ... it has taken so long for it to come to court or, you know, was because they wanted to maybe try to establish or find out if he was crazy or sane or, you know, and it had to be determined by a court ... a judge to decide the state of mentality.... Well, they were saying in the ... community that a white lady is dead, a black guy did it, they're going to tar and feather him. Okay.
Manning further expressed that "whoever [committed the murder] should be held accountable for that because a life was lost needlessly." Manning pondered that "[i]t wouldn't have made me any difference if they hung him." Considering these responses, the state's decision not to challenge Manning for cause is not surprising. In the instant case, neither the numbers nor the facts support showing that the State based its peremptory challenge on race. Notwithstanding that the state did not articulate race-neutral reasons in this pre-Johnson landscape, the trial judge in the present case took a very active role in voir dire. His finding that no discriminatory purpose tainted the state's peremptory strikes is borne out by the record, and no abuse of discretion is apparent. Under the circumstances, defendant's Batson claims fail on the merits and no relief appears due.

PENALTY PHASE
In this assignment of error, defendant argues that the heinous, atrocious, and cruel aggravating factor is unconstitutionally vague and, even if construed as constitutional, the evidence presented in his case was insufficient to support a finding of this aggravator. Appellate counsel suggests that this Court reconsider its ruling in State v. Hoffman, 98-3118, pp. 33-34 (La.4/11/00), 768 So.2d 542, 573-74, in which the Court held that a limiting instruction on heinousness could cure the constitutional infirmity of vagueness as to that aggravator.
For a crime to have been committed in an especially heinous or cruel manner, the evidence must support a finding of torture or pitiless infliction of unnecessary pain. State v. Hoffman, 98-3118, pp. 33-34 (La.4/11/00), 768 So.2d 542, 574; State v. Hamilton, 92-1919, pp. 14-15 (La.9/5/96), 681 So.2d 1217, 1226; State v. Eaton, 524 So.2d 1194, 1210-11 (La.1988), cert. denied, 488 U.S. 1019, 109 S.Ct. 818, *1007 102 L.Ed.2d 807, rehg. denied, 489 U.S. 1061, 109 S.Ct. 1332, 103 L.Ed.2d 600 (1989); State v. Brogdon, 457 So.2d 616, 631 (La.1984). To support a finding of heinousness, this Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhuman manner, so that the victim experienced great pain and was aware of his/her impending death. State v. Castleberry, 98-1388, p. 31 (La.4/13/99), 758 So.2d 749, 774 (finding heinous nature of crime supported the death penalty given that defendant forced the victim to look at him before beating him about the head with an iron skillet with such force that the skillet broke and then, finding the victim still alive, smothered him to death, all while the victim was bound and gagged). This Court considers awareness of impending doom relevant in a finding of heinousness. State v. Weary, 03-3067, p. 24 (La.4/24/06), 931 So.2d 297, 314 (sufficient evidence of heinousness where the victim was subjected to continuous vicious beatings as he was driven from place to place; witness testified that victim attempted to escape and that victim moaned throughout ordeal before ultimately succumbing to injuries incurred when defendant ran over him with victim's own car).
In the present case, the trial court instructed the jurors with the following limiting instruction: "In order for you to find the offense was committed in an especially heinous, atrocious, or cruel manner, there must exist evidence from which you can find beyond a reasonable doubt that there was torture or the pitiless unnecessary infliction of pain on the victim." With this guidance, the jurors were able to use their common sense and life experiences to assess the pain Mrs. Brinson experienced when she was stabbed repeatedly by defendant. The trial court's limiting instruction met the strictures of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), and the jury was educated to the narrow construction to be given to the terms "heinous, atrocious, or cruel manner." Consequently, defendant fails to demonstrate prejudice to substantial rights so as to deprive him of a reliable sentencing determination.
To assess the sufficiency of the state's evidence in support of the aggravating circumstance of heinousness, the jury was guided by the testimony of Dr. Steven Coswell, the forensic pathologist who conducted the autopsy on Oneatha Brinson. Dr. Coswell began by giving the cause of death as multiple stabs wounds, followed by a detailed description of the number and severity of each of the stab wounds suffered by Mrs. Brinson. Dr. Coswell elaborated on four fatal stab wounds to her torso, one of which penetrated her breastbone, perforated the left atrium of her heart and perforated her aorta. The second wound punctured the right breast and further penetrated into her right lung. The third wound entered her chest through the diaphragm, penetrated five inches before hitting Mrs. Brinson's liver. The fourth stab wound to her torso, began at the middle of the left armpit, heading backwards into the abdomen, puncturing several loops of intestine, hitting her kidney, before coming to rest in the muscles of her back. Dr. Coswell described how Mrs. Brinson died:
The sum total of these stab wounds is approximately a quart of blood within her chest and pericardial sac and a fair amount of bleeding into the soft tissue around the kidney, all of these being fairly well supplied with blood vessels. And basically that is Mrs. Brinson's mechanism of death is that she bled to death not only blood outside her body but also the blood inside her body.... Mrs. Brinson was not a very large woman, she was only about five foot three *1008 inches tall so her blood volume would be such that losing a quart or a liter of blood would be ... a little over a quarter of her blood volume, and that in itself would be sufficient to cause death.
Dr. Coswell further testified to multiple blunt force injuries Mrs. Brinson sustained, including a wound to her head that appeared to have been caused by a chain necklace she was wearing which penetrated her skull as a result of being slammed against her head through forceful contact with some stationery object such as the floor or a wall. Dr. Coswell opined that "[t]his is a pretty significant amount of force because ... there's enough force there to actually crush all the way down to the skull."
Moreover, Dr. Coswell described the numerous defensive wounds Mrs. Brinson sustained. He informed the jury that defensive wounds occur "[t]ypically if two (2) people are fighting and one person is stabbing or cutting the other person, the person who is being cut or stabbed will try to ward off the knife or fend off the knife. This usually means throwing up arms and hands to try to block the knife.... we'll see cut marks or stab wounds on the back or the outside of the forearm and on the hands classically if somebody grabs a knife blade and the knife is pulled out from their hand or actually driven along the palm and you will get cut marks on the palm of the hand or on the area of the thumb." Dr. Coswell concluded his jury presentation by detailing the numerous areas of bruising/contusions evident on Mrs. Brinson's body, as well as numerous abrasions.
Furthermore, the jury could draw on defendant's own words as to the final agonizing moments of life Mrs. Brinson endured in evaluating the state's presentation of evidence to support the aggravating circumstance of heinousness. Defendant's taped custodial statement was played to the jury during the guilt phase of trial, at which time the state passed to each of the jurors, transcribed copies of the statement, as an aid. In his statement, defendant admitted to going to Mrs. Brinson's house in the late afternoon of September 29, 2000 under the pretext of securing a day when he could do yard work again for her, having once been hired by her, a week or so earlier. During their conversation, Mrs. Brinson asked defendant if he would like a cold drink. They went inside her kitchen together. In his statement, defendant claimed that Mrs. Brinson was the aggressor and pulled a knife on him, cutting him once on the arm. He claimed he disarmed her of the knife, and initially, defendant maintained that he only stabbed Mrs. Brinson one time, and then only because she lunged at him and impaled herself onto the knife blade. Defendant elaborated as the statement progressed, describing a violent struggle with Mrs. Brinson in which he slammed her into the wall. The detectives asked if after he stabbed Mrs. Brinson, was she still alive:
A: She was still alive.
Q: Was she saying anything?
A: She was moaning.
Q: Moaning? Alright what did you do?
A: I walked around.
* * *
Q: Was she still over there moaning and moving around?
A: Yes.
Q: Did you see blood on her and stuff?
A: No.
D: ... did you think about calling anybody to help her?
A: No.

*1009 * * *
Q: Okay, so you told us that uh when you stabbed her the second time that she was on the floor?
A: Yes she was on the floor.
Q: So she was already laying on the floor?
A: Right.
Q: Why did you stab her a second time... she was already on the floor ... she was already down ... she was no threat to you at all ... why did you stab her the second time?
A: I don't know I just ...
Q: What was your feelings at that time... were you mad or were you scared or what?
A: It was probably just being I was in a rage.
Q: You were in a rage? Do you think maybe in this rage you stabbed her more than that once?
A: Probably could.
Q: You said after that she was uh ... she was moving around on the floor moaning and that sort of thing?
A: Yes.
Q: Why wouldn't you have called the ambulance for her?
A: Well cause ...
Q: Cause you were mad at her?
A: Yes.
Q: And you really didn't give a shit what happened to her from then on?
A: No.
Q: Isn't that right?
A: That's right.
After stabbing Mrs. Brinson, defendant related that the victim fell to the floor, but at one point, "she sat back up like this here. I dropped the knife and I reached over on the table ... I got the glass and hit ... (pounding on table sound)... her in the head with the glass."
After Mrs. Brinson was incapacitated, defendant described walking around her house looking for things to steal and found a TV/VCR combination, some bags of coins, and her car keys, items which he would later trade for crack cocaine.
Despite his claims of stabbing Mrs. Brinson only once, or maybe twice, the photographs and the coroner's testimony, as well as the autopsy protocol, reveal the victim was stabbed at least 10 times, with penetrating wounds as deep as five inches into her body, hitting vital organs at every turn. Nevertheless, the small, 85-year-old woman fought with all her might, a fact which defendant conceded in his statement. But her efforts were overcome by defendant's greater strength and callous indifference to her humanity. The evidence supports a finding of pitiless infliction of unnecessary pain on a victim who retained a definite awareness of her impending doom. Clearly the jury believed that the 10 major stab wounds Mrs. Brinson received involved great pain that was sufficient to support a finding that the offense was committed in an especially heinous and cruel manner. LSA-C.Cr.P. art. 905.4(A)(7).
The facts of this case are not unlike others in which the Court has found no error in juries' determinations that the offense was committed in an especially heinous, atrocious or cruel manner. See Manning, 03-1982, pp. 68-72, 885 So.2d at 1103-06 (Court found heinousness where defendant abducted 62-year-old victim, and forced her to drive him 17 miles to a remote spot where he severely beat her about the face and chest before slashing her neck, severing her airway; estimated 20 to 60 minutes to die); State v. Legrand, 02-1462 (La. 12/3/03), 864 So.2d 89 (victim stabbed over 25 times with a variety of *1010 weapons); State v. Rault, 445 So.2d 1203, 1219 (La.1984) (victim was raped, strangled, stabbed in the neck and shot twice; Court specifically notes victim's intense mental, as well as physical, pain during the ordeal); State v. Flowers, 441 So.2d 707, 718 (La.1983) (a 70-year-old widow was severely beaten, raped and strangled in her home); State v. Willie, 436 So.2d 553, 556-57 (La.1983) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed); State v. Taylor, 422 So.2d 109, 117-18 (La.1982) (victim stabbed over 20 times; slow manner of death); State v. Moore, 414 So.2d 340, 348 (La.1982) (victim received 13 stab wounds and died slowly "with awareness of her impending death").
Nevertheless, even if this Court determines that facts of this murder do not support a finding of heinousness, this Court has held on numerous occasions that the failure of one or more statutory aggravating circumstances does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the proceedings. State v. Wessinger, 98-1234, p. 16 (La.5/28/99), 736 So.2d 162, 192; State v. Letulier, 97-1360, p. 25 (La.7/8/98), 750 So.2d 784, 799. Evidence of this aggravating circumstance did not interject an arbitrary factor into these proceedings because evidence of the manner in which the offense was committed and of the nature of the victim's injuries was relevant and properly admitted at trial. Furthermore, the remaining aggravating circumstance was more than amply supported, i.e., that the victim was over 65 years of age. LSA-C.Cr.P. art. 905.4(A)(10). Hence, no arbitrary factor was interjected into the proceedings. See State v. Roy, 681 So.2d 1230, 1242 (La. 1996). Consequently, this assignment lacks merit.

Victim's Age as Aggravating Factor
In this assignment of error, defendant urges that a statutory element or aggravating factor basing death eligibility on the victim's age is an arbitrary classification that violates equal protection. Defendant's challenge is based on this Court's pronouncement in State v. Bowie, 00-3344, (La.4/3/02), 813 So.2d 377, 395, which recognized that:
"This Court has never explicitly addressed the validity of the victim's age as a factor elevating a killing to first degree murder or as an aggravating circumstance supporting imposition of the death penalty." Consequently, defendant observes that absent a controlling ruling from this Court, the issue remains unresolved.
La. Const. art. I, § 3 provides that "[n]o law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of ... age." Equal protection guarantees require that state laws affect alike all persons or interests similarly situated, but differences in legislative treatment may validly be accorded persons or interests classified differently, provided there is shown a rational basis for differentiation which is reasonably related to a legitimate governmental purpose. U.S. Const. amend. XIV; La. Const. art. I § 3; State v. Bell, 377 So.2d 303, 305 (La. 1979). In Manuel v. State, 95-2189, pp. 4-5, (La.7/2/96), 692 So.2d 320, 339-40, this Court held that statutes classifying persons based on age are unconstitutional unless the classification "substantially furthers an appropriate governmental purpose."(emphasis in original). Age classification review applies the intermediate scrutiny standard adopted in Sibley v. Board of Supervisors of Louisiana State *1011 University, 477 So.2d 1094, 1107-08 (La. 1985). Manuel, 95-2189, at 17, 692 So.2d at 345. Nevertheless, appellate counsel in the present case suggests that this Court apply strict scrutiny to resolve the issue because the differential treatment imposed by the application of LSA-C.Cr.P. art. 905.4(A)(10) is an arbitrary classification system in violation of defendant's rights under the Fifth, Fourteenth, and Eighth Amendments. But see Styron v. Johnson, 262 F.3d 438, 452-53 (5th Cir.2001) (declining to apply strict scrutiny to an equal protection challenge brought by capital murder defendant sentenced to death on the basis of the Texas aggravating circumstance of murdering a child under the age of six years; rational basis analysis applied). There the Fifth Circuit opined: "`[A]ge is not a suspect classification under the Equal Protection Clause. States may discriminate on the basis of age without offending the Fourteenth Amendment if the age classification in question is rationally related to a legitimate state interest.'" Id. (quoting Kimel v. Florida Bd. of Regents, 528 U.S. 62, 83-84, 120 S.Ct. 631, 646, 145 L.Ed.2d 522 (2000) (citations omitted)).
The United States Supreme Court requires that there be a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." Furman v. Georgia, 408 U.S. 238, 313, 92 S.Ct. 2726, 2764, 33 L.Ed.2d 346 (1972) (White, J., concurring); Cf., Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983)(a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," to pass constitutional muster).
In the present case, although the state employed the short form indictment charging defendant generally with the first degree murder of Oneatha Brinson, the trial court's preliminary instructions to the jury at the commencement of the guilt phase advised that the indictment in this case is based on the killing of a human being (1) when the offender has the specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of an armed robbery; or (2) when the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of 12 or 65 years of age or older. In addition, as grounds for seeking the death penalty, the state alleged three aggravating circumstances: 1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery, first degree robbery, or simple robbery; 2) the victim was 65 years of age or older; 3) the offense was committed in an especially heinous, atrocious or cruel manner. LSA-C.Cr.P. art. 905.4(A)(1), (10), (7). The jury found the latter two of the three aggravating circumstances presented.
In State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160 (unpub'd appx), this Court observed that "[t]he legislature has recognized that the very young and those over the age of sixty-five are more vulnerable and less able to defend themselves than members of other age groups." Although relegated to the unpublished appendix, presumably because the aggravating circumstance of the age of the victim was not offered by the state in that case, Gradley held that the legislature may define crimes differently depending on the age of the victim, where, as here, it has a legitimate government interest in safeguarding the welfare of those more needful of protection.
*1012 The Louisiana capital sentencing scheme has sufficiently narrowed the definition of capital murder to a finite set of circumstances, LSA-R.S. 14:30, and then only when "the jury finds beyond a reasonable doubt at least one statutory aggravating circumstance exists and, after consideration of any mitigating circumstances, determines that the sentence of death shall be imposed." LSA-C.Cr.P. art. 905.3. Murdering a person over the age of 65 years is a sufficiently narrow statutory aggravating circumstance. LSA-C.Cr.P. art. 905.4(A)(10). The age classification in question is rationally related to a legitimate state interest of protecting a vulnerable population of Louisiana's citizens. Under these circumstances, no violation of the prohibition against cruel and unusual punishment is gleaned by punishing with death a defendant who brutally killed an 85-year-old female. Defendant's arguments to the contrary lack merit.

The Improper Use of Victim Impact Testimony at the Penalty Phase of Defendant's Trial Interjected an Arbitrary Factor Into the Jury's Deliberations.
In this assignment of error, defendant claims that his death sentence is excessive, arbitrary, and capricious in violation of his federal and state constitutional rights.
In the present case, the state filed pretrial notice of its intent to introduce victim-impact evidence pursuant to State v. Bernard, 608 So.2d 966 (La.1992). Shortly thereafter, the state amended its notice to name witnesses, Ann Brinson Joslin, daughter of the victim; and Jerry Smith, co-worker of the victim. Attached to that notice, Joslin prepared a two-page summary of her sentiments on the loss of her mother. Here, appellate counsel complains that the testimony of Jerry Smith exceeded the bounds of admissible victim-impact testimony.
As an initial matter, defense counsel failed to object to any portion of Jerry Smith's testimony. Thus, technically, the issue was not properly preserved for appellate review. LSA-C.Cr.P. art. 841; State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 181 (scope of review in capital cases is limited to alleged errors that are contemporaneously objected to; revived the contemporaneous objection rule for the penalty phase as well as guilt phase of a capital trial). In any event, a review of Smith's testimony reveals no improper victim-impact testimony.
In Bernard, this Court held that the state may "introduce a limited amount of general evidence providing identity to the victim and a limited amount of general evidence demonstrating harm to the victim's survivors." Bernard, 608 So.2d at 972. In providing guidance for the proper introduction of victim impact evidence, the Court instructed that the state may present evidence reasonably showing that the defendant "knew or should have known that the victim, like himself, was a unique person and that the victim had or probably had survivors...." Id. In addition, LSA-C.Cr.P. art. 905.2 provides that "[t]he sentencing hearing shall focus on the circumstances of the offense, the character and propensities of the offender, and the victim, and the impact that the crime has had on the victim, family members, friends, and associates."
The testimony of Jerry Smith, including cross-examination, spanned approximately four pages of the penalty phase transcript. Smith testified that he had worked with the victim, Nita Brinson, for about 10 years in the start-up phases of a museum dedicated to veterans at Selman Field. He described their "special relationship" in that she was responsible for raising funds and he focused on the repair and renovation of the building. "[I]t was her dream *1013 to build this museum at the airport.... So she got about trying to save the building [where] we are housing memorabilia from Selman Field, from General Chenault and the Flying Tigers and also Delta Airlines.... I was quite impressed with her, I believed in the vision and that's what we were about." Smith went on to recall that after the horrifying news of Nita's death, the $10,000 needed to finish the museum project came forth in the form of memorials to her from all over the United States, enabling the slated opening of November 11, 2000 to be maintained. Smith noted that:
Nita had a deep love for the veterans. She said our school kids don't know anything about what happened back then. And it was her dream that we could bring the kids in.... You know, America almost lost our freedom when World War II started. People don't realize that. When we bring school kids through [the museum], they don't really know what happened, the rationing, the sacrifices that people at home had to make. And the thousands of men who died and women. And it was her desire and mine too and everybody else in this group to carry on this history and to tell our people how grateful we should be to all of our veterans.
At the heart of appellate counsel's complaint in this part is the state's juxtaposition of the worth of the life of the victim, a lover of veterans, a patriot, a pillar of the community, versus the life of defendant "a career criminal." Indeed, the state opened its penalty phase case-in-chief with the testimony of the Deputy Clerk of Court for Ouachita Parish who detailed defendant's criminal record for the jury. The next witness the state called was Jerry Smith, whose brief remarks are the subject of this portion of assignment of error, and finally, the state closed its case-in-chief with the testimony from the victim's daughter.
The juxtaposition argument was the inevitable offshoot after the legislature amended LSA-C.Cr.P. art. 905.2 to provide that a capital sentencing hearing shall focus the character and propensities not only of the defendant but also of the victim. See 1999 La. Acts, No. 783, § 3, effective January 1, 2000. Consequently, the focus of the last 10-year period of the 85-year-old victim's life was centered not on raising a family or managing a thriving real estate career, both of which Nita Brinson had accomplished years earlier. Rather, the focus of her last decade of life was dedicated to starting a museum to educate the children of Ouachita Parish about the patriotism and heroism of its veterans, and to open their young eyes to the costs of war. That focus was what made this victim a unique person that Smith sought to portray in his victim-impact testimony.
Nothing in the testimony of Jerry Smith exceeded the permissible scope of LSA-C.Cr.P. art. 905.2 or Bernard, nor did it interject an arbitrary factor into the jury's sentencing determination. No relief is due here.

The Trial Court Improperly Restricted the Defense's Attempt to Elicit Testimony in Support of Mitigating Evidence.
Next, appellate counsel complains that the trial court cut off defense cross-examination of the victim's daughter, Ann Brinson Joslin, when counsel sought to equate her loss of her mother to the potential pain that defendant's family might experience in losing him to execution, in the following colloquy:
Q: Do you think it's conceivable that other people might be hurt by the loss of a loved one also?
A: Of course, Mr. Scott, yes.

*1014 Q: Even if that person is not a pillar of the community and has been a bad person and has done some things wrong? Do you think it's still conceivable that his family ...
The prosecutor interrupted with an objection which the trial court promptly sustained, directing counsel to move on with an abrupt, "Next question."
The present scenario, in which counsel sought to invoke a "mercy" theme from the victim's daughter, is the reverse of that faced by the Court in State v. Manning, 03-1982 (La.10/19/04), 885 So.2d 1044. There, the trial court sustained the state's objections to defense counsel questioning Manning's mother and sister if they wanted the jury to spare Manning's life. Manning, 03-1982 at 61-62, 885 So.2d at 1098-00. Recalling Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (permissible victim-impact evidence does not include "the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence...."), this Court held that the trial court erred in sustaining the state's objection which cut off an attempt at the witnesses' response, but that the error was harmless because the jury would have inferred that the family members would have expressed a preference for life if they had been permitted to answer. Manning, 03-1982 at 61-62, 885 So.2d at 1098-00. The Court reasoned that in this situation:
Concerns for an even playing field must yield to the defendant's constitutional right to present any relevant mitigation evidence. While the Eighth Amendment allows the State to present only a limited amount of victim impact evidence, carefully circumscribed in scope, "[u]nder the aegis of the Eighth Amendment [the Supreme Court has] given the broadest latitude to the defendant to introduce relevant mitigating circumstances reflecting on his individual personality, and the defendant's attorney may argue that evidence to the jury." Payne, 501 U.S. 826-27, 111 S.Ct. at 2609. Given the breadth of the defendant's Eighth Amendment right to present any and all relevant mitigating evidence, it would be a difficult rule of law to enforce that the defendant's family members may restate in exacting detail the extenuating circumstances in the defendant's background and yet not express their conclusion based on that evidence that the defendant should live despite the severity of his crime. Id.

In the present case, the trial judge gave the defense the broadest of free reign to query each of defendant's family members, as well as his friends who testified as mitigation witnesses, as to how they would be affected if defendant received the death penalty. Here, unlike in Manning, the judge permitted defendant's friends and family members to express freely the negative impact it would have on them and their family if defendant were executed. However, the judge drew the line at counsel's attempt to place the victim's daughter into that same category. To the extent that the judge precluded counsel from asking the victim's daughter to speculate on how the defendant's family members would feel were the jury to return a verdict of death, the decision to sustain the state's objection was correct. The error was surely harmless under the standard articulated in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988)(O'Connor, J.)(harmless-error analysis begins with the premise that the evidence admitted at trial is sufficient to support the verdict and asks whether the state can prove "`beyond a *1015 reasonable doubt that the error complained of did not contribute to the verdict obtained.'")(quoting Chapman). In the end, an appellate court must satisfy itself that the jury's verdict in the particular case was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State v. Sanders, 93-0001, p. 25 (La.11/30/94), 648 So.2d 1272, 1291.
At any rate, at the close of counsel's very brief cross-examination of Ann Joslin, he asked whether her mother (the victim) was "a devout Catholic ... a generous and merciful individual," to which Joslin replied, "I believe those would adequately describe her in that respect." So, through the back door, counsel delivered his "mercy" theme. No relief appears due under this portion of this argument.

Unconstitutionality of Death Penalty (Ring v. Arizona)

In this assignment of error, defendant asserts that the Louisiana death penalty statute is unconstitutional because it fails to require the jury to determine that death is the appropriate punishment "beyond a reasonable doubt." Citing Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), defendant complains that Louisiana's capital sentencing scheme is based on "standardless jury discretion" which violates the Eighth and Fourteenth Amendments.
However, Ring requires that jurors find beyond a reasonable doubt all of the predicate facts which render a defendant eligible for the death sentence, after consideration of the mitigating evidence. Id., 536 U.S. at 609, 122 S.Ct. at 2443. While defendant now argues that Ring should extend such a requirement to the ultimate sentence as well as the predicate facts, neither Ring, nor Louisiana jurisprudence for that matter, requires the jurors to reach their ultimate sentencing determination beyond a reasonable doubt. State v. Koon, 96-1208, p. 27 (La.5/20/97), 704 So.2d 756, 772-73 ("Louisiana is not a weighing state. It does not require capital juries to weigh or balance mitigating against aggravating circumstances, one against the other, according to any particular standard.") (citation omitted). This argument lacks merit.

CAPITAL SENTENCE REVIEW
Under LSA-C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The Department of Public Safety and Correction submitted a Capital Sentence Investigation Report ("CSIR"). See La. S.Ct.R. 28 § 3(b). The Sate filed a Sentence Review Memorandum, and the defense filed a brief captioned, "Appellant's Response to the State's Sentencing Memorandum," which in fact was more akin to a supplemental to its original appellate brief.
Those documents, along with penalty phase testimony of defendant's relatives, indicate that defendant, Henry Joseph Anderson, is an African-American male, born on April 19, 1962, in Winnfield, Louisiana, to the marital union of Johnny Anderson, Jr. and Johnnie Gibson Anderson. Defendant has four brothers and two sisters, one half-brother and two half-sisters. Defendant was the third of these nine children, but the oldest child raised in the home, as his two older sisters lived in Winnfield with relatives. Two of *1016 defendant's siblings had died of cancer by the time of his capital trial.
Defendant's father was a packer and manager at Action Moving and Storage, and subsequently owned his own moving company prior to his death from cancer in 1996. Defendant's mother was a homemaker, a substitute teacher, and worked part-time as a packer with the moving company. She died in her sleep in 2001 from a massive heart attack.
Defendant lived most of his life in Monroe, Louisiana, growing up in the Booker T. area. Defendant was educated in the Monroe City Schools. Defendant repeated the second grade twice, and the third, eighth, and tenth grades once, and readily admitted to skipping a lot of school. While defendant denied ever being expelled from school, he acknowledged various suspensions based on his unruly conduct. Defendant dropped out of Carroll High School in the eleventh grade at age 21, and obtained his GED in 1982.
Defendant's employment history is sporadic. After quitting school, he worked some for his father's moving company. He claimed that he was employed for a six-month period with Bountiful Foods when he was in a half-way house before being fired. Defendant further claimed that he worked at Tinseltown for one month performing janitorial duties. At the time of the instant offense, defendant had performed yard work for Oneatha Brinson on one occasion, approximately a week before she died. Defendant admitted that he basically relied on others for financial support, although he admitted to owing the IRS back taxes.
Defendant never served in the military. He never married and does not have any children.
As a child, defendant suffered from rheumatic fever and developed some heart problems as a result. He missed one year of school based upon his extended hospitalization therefor. Defendant admitted to using crack cocaine, and alcohol, although his reports varied as to the degree of use as to each. Defendant was found competent to proceed to trial, see Argument II, supra, but raised his mental retardation as an absolute bar to the death penalty. Ample evidence that defendant exaggerated his responses on his intellectual functioning and personality tests surely factored in the jury's unanimous determination that defendant is not mentally retarded.
According to the CSIR, defendant has no juvenile criminal record. However, as an adult, defendant attained fifth felony offender status. His rap sheet reflects a lengthy accumulation of felony arrests, most of which resulted in conviction:
1. On 4/11/84 defendant was arrested for attempted armed robbery of an army surplus store clerk using a small caliber handgun in West Monroe. Defendant became frightened and fled the premises after the clerk pushed an alarm button. He was sentenced to three years imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
2. On October 11, 1989, defendant was arrested for theft between $50 to $200. The state amended the charge to attempted theft, defendant pled guilty and received a fine.
3. On July 26, 1990, defendant was arrested for unauthorized use of a movable. He pled guilty and received a suspended sentence and a fine.
4. On November 27, 1990, defendant was arrested for theft of a motor vehicle. He pled guilty and received a six-month sentence.
5. On October 14, 1991, defendant was arrested for simple burglary. He pled guilty to attempted simple burglary and *1017 was sentenced to four years imprisonment at hard labor.
6. On May 11, 1992, defendant was arrested for three counts of forgery. He pled guilty to attempted forgery and was sentenced to two years imprisonment at hard labor.
7. On March 19, 1996, defendant was arrested for simple burglary of an inhabited dwelling and illegal possession of stolen things. He pled guilty and was sentenced to six years imprisonment at hard labor. Defendant was on parole for these offenses at the time of the instant murder.
One month before defendant's arrest for murder, Caddo Parish issued a bench warrant for his arrest on the charge of felony theft. That warrant remained outstanding. Defendant was arrested on the instant charge of first degree murder on October 2, 2000. While incarcerated and awaiting trial, defendant was charged with battery on a police officer in an incident where defendant became belligerent and was ultimately subdued with pepper spray. These charges were dismissed in 2003.
Defendant did not testify at either the guilt or penalty phase of his capital trial. However, defendant made a recorded post-arrest statement at the Monroe Police Department, which was played to the jury at trial, and in which he admitted stabbing Oneatha Brinson to death and then taking personal property from her home, including her vehicle. The defense put forth various defense theories, including manslaughter, claiming that defendant was acting in a rage after Mrs. Brinson called him a "nigger;" self-defense, claiming that Mrs. Brinson first attacked him with the knife, after which he disarmed her and stabbed her; and finally, diminished capacity, based on his mental retardation.
The defense presented 10 witnesses at the penalty phase: a psychologist (Dr. Baker), a general physician (Dr. Wheeler), a school superintendent with Monroe City Schools, defendant's brother, his sister, two half-sisters, and three family friends. On June 15, 2005, the court imposed the sentence of death, as unanimously recommended by the jury.

PASSION, PREJUDICE, AND OTHER ARBITRARY FACTORS
The first degree murder of Oneatha Brinson occurred on September 29, 2000, and following jury selection, trial commenced on April 25, 2005, over four years after the crime was committed. Pretrial publicity was a factor during jury selection, and many potential jurors remembered the incident from news stories. However, no change of venue was requested.
The victim, Oneatha Brinson, was a Caucasian female, who was 85 years old at the time of her death. Defendant is an African-American male, who was 38 years old at the time of this offense. Defendant raised the issue of race beginning with his custodial statement to members of the Monroe Police Department in which he claimed that he stabbed Mrs. Brinson after she said "you nigger you need to go on and do the yard." However, none of the police officers taking the statement believed that an 85-year-old woman would initiate an attack by uttering such a disparaging statement to a much larger and stronger male. At any rate, later in the taped statement, defendant told the officers that he was not mad that she had used the "n" word, and indicating that he does not get affected by "stuff like that." However, a crime scene photograph of the victim's bedroom depicts various framed photographs of her cherished ones on her dresser, and one of the photos appears to be that of an African-American female, suggesting *1018 that Mrs. Brinson did not make that racial slur.
Defendant's jury was composed of three African-American jurors, and nine Caucasian jurors. Defendant argued that African-Americans were excluded from his jury in violation of Batson v. Kentucky, supra. The trial court found no proof that a discriminatory intent tainted the state's exercise of its peremptory challenges. No prejudice is apparent.
For the first time in defendant's supplemental brief filed on July 24, 2007, appellate counsel reworked the "worth of the victim" claim from the original appellate brief, to claim for the first time that the state offered "subtle comparisons between the victim and the defendant" which reflected "racial and socioeconomic undertones that permeated the proceedings." A review of the portions of transcript in contention in this assignment of error shows absolutely no underlying racism. The race of the victim was never bantered about as one of her virtues, and defendant's race was never even mentioned apart from the responses of prospective jurors during voir dire. In all respects, defendant's capital trial appears to have been conducted free of any racial taint.

AGGRAVATING CIRCUMSTANCES
The State relied on three aggravating circumstances under LSA-C.Cr.P. art. 905.4(A), and the jury returned the verdict of death, agreeing that two aggravating circumstances were supported by the evidence: (1) the victim was 65 years of age or older; and (2) the offense was committed in an especially heinous, atrocious or cruel manner. LSA-Cr.P. art. 905.4(A)(10), (7); see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Here, the State's evidence presented in the guilt phase, and reintroduced at the penalty phase, established that the brutal stabbing of Oneatha Brinson was a cruel and painful demise for the woman who had given this defendant an opportunity to earn an honest wage by cutting her grass. Defendant stabbed Mrs. Brinson at least 10 times, some wounds penetrating up to five inches deep, and left her to bleed to death on her kitchen floor while he repeatedly walked past her outstretched body as he carried away her possessions. The jury's finding of heinousness was fully supported by the evidence. Further, the State's evidence supported the jury's finding that Mrs. Brinson was 85 years old at the time of her death, well past the statutory threshold age of 65 required to capitalize the offense of murdering such a senior citizen. Consequently, defendant's sentence of death is firmly grounded on the finding of these two aggravating circumstances.

PROPORTIONALITY
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321, 1341 (La.1990); State v. Thompson, 516 So.2d 349, 357 (La.1987). This Court, however, has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (in case reversed on other grounds, dictum suggesting that death penalty disproportionate).
*1019 This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Sonnier, 380 So.2d at 7.
The State's Sentence Review Memorandum reveals that since 1976, jurors in the Fourth Judicial District Court (Ouachita and Morehouse Parishes) have recommended imposition of the death penalty six times, including defendant's case, five of which survived on direct appeal to finality. The State points out that during the period between January 1, 1976 to January 1, 1985, the policy of the district attorney in that district was not to seek the death penalty on any first degree murder case if the defendant would plead guilty and agree to a life sentence. Consequently, during that period, there was only one first degree murder case that originated in that district in which the death penalty was sought. See State v. Baldwin, 388 So.2d 664 (La. 1980) (defendant convicted of first degree murder of an 85-year-old female, and executed in 1984).
It is appropriate for this Court to look beyond the 4th JDC and conduct the proportionality review on a statewide basis. Cf. State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31. This Court has observed that Louisiana juries appear especially prone to impose capital punishment for crimes committed in the home. See State v. Holmes, 06-2988, appeal presently pending in this Court; State v. Coleman, 06-0518, (La.11/2/07), 970 So.2d 511 (conviction reversed and death sentence vacated by this Court on a Batson violation; remanded for new trial); State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108; State v. Bridgewater, 00-1529 (La.1/15/02), 823 So.2d 877; State v. Jacobs, 99-1659 (La.6/29/01), 789 So.2d 1280; State v. Howard, 98-0064 (La.4/23/99), 751 So.2d 783; State v. Gradley, 97-0641 (La.5/19/98), 745 So.2d 1160; State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8; State v. Code, 627 So.2d 1373 (La.1993); State v. Burrell, 561 So.2d 692 (La.1990); State v. Perry, 502 So.2d 543 (La.1986); State v. Wingo, 457 So.2d 1159 (La.1984); State v. Glass, 455 So.2d 659 (La.1984); State v. Summit, 454 So.2d 1100 (La.1984); State v. Williams, 490 So.2d 255 (La.1986). Wingo observed in this regard that "[t]he murder of a person by an intruder violating the sanctuary of the victim's own home [is] a particularly terrifying sort of crime to decent, law abiding people." Id., 457 So.2d at 1170.
Finally, with respect to LSA-C.Cr.P. art. 905.4(A)(10) and LSA-R.S. 14:30(A)(5) (victim over the age of 65), juries in Louisiana have readily returned the death sentence when the elderly are prayed upon as victims. See State v. Draughn, 05-1825 (La.1/17/07), 950 So.2d 583; Bridgewater, supra; Jacobs, supra; State v. Bowie, 00-3344 (La.4/3/02), 813 So.2d 377; Howard, supra; Gradley; supra; State v. Tart, 93-0772 (La.2/9/96), 672 So.2d 116; State v. Taylor, 99-1311 (La.1/17/01), 781 So.2d 1205; Baldwin, supra.
Compared to these cases, it cannot be said that the death sentence in this case is disproportionate. Nothing in any of the post trial documents filed pursuant to La. S.Ct.R. 28 warrants reversal of defendant's death sentence.
In conclusion, we find that despite defendant's efforts to claim mental retardation as a complete bar to capital punishment under Atkins v. Virginia, supra., he does not meet Louisiana's definition because no symptoms of mental retardation manifested themselves by age 18. LSA-C.Cr.P. art. 905.5.1(H)(1). While defendant's *1020 IQ test revealed a full-scale score of 73, defendant could conceivably fall below the standard cut-off of 70 for intellectual functioning given a standard deviation. State v. Williams, 01-1650, pp. 23-24, n. 26 (La.11/1/02), 831 So.2d 835, 853-54. However, the record is replete with evidence, including by defendant's own mental retardation expert, that defendant's testing scores showed evidence of gross exaggeration. Similarly, LSA-C.Cr.P. art. 905.5.1(H)(2)(s), which provides that traumatic brain injury occurring after age 18 "does not necessarily constitute mental retardation" gives defendant no shelter because no less than three experts concurred that defendant's 1994 concussion from a severe beating (at age 32) did not result in any long-lasting cognitive impairment, rendering moot defendant's Equal Protection challenge to LSA-C.Cr.P. art. 905.5.1 in which he claimed that it deprived him of his basic right to life by excluding him from exemption from the death penalty based solely on the age of onset of his symptoms of mental retardation. Consequently, the jury was justified in unanimously determining that defendant was not mentally retarded.
Otherwise, no reversible error is discerned at either phase of trial. The guilt phase evidence fully supports the jury's determination that defendant specifically intended to, and did kill an 85-year-old victim by stabbing her over 10 times, and that the killing occurred during the perpetration or attempted perpetration of an armed robbery. LSA-R.S. 14:30(A)(1) and (5). During the penalty phase, the jury found two of the three aggravating circumstances urged by the state. The evidence supported the jury's finding that the victim was over the age of 65, LSA-C.Cr.P. art. 905.4(A)(10), and that the offense was committed in an especially heinous, atrocious or cruel manner. LSA-C.Cr.P. art. 905.4(A)(7).

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La. R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED
NOTES
[1] No post-trial motions were filed on the defendant's behalf.
[2] La. Const. art. V, § 5(D) "... provides in: "... a case shall be appealable to the Supreme Court if ... (2) the defendant has been convicted of a capital offense and a penalty of death actually has been imposed.""
[3] LSA-C.Cr.P. art. 905.5.1. Mental retardation

A. Notwithstanding any other provisions of law to the contrary, no person who is mentally retarded shall be subjected to a sentence of death.
B. Any capital defendant who claims to be mentally retarded shall file written notice thereof within the time period for filing of pretrial motions as provided by Code of Criminal Procedure Article 521.
C. (1) Any defendant in a capital case making a claim of mental retardation shall prove the allegation by a preponderance of the evidence. The jury shall try the issue of mental retardation of a capital defendant during the capital sentencing hearing unless the state and the defendant agree that the issue is to be tried by the judge. If the state and the defendant agree, the issue of mental retardation of a capital defendant may be tried prior to trial by the judge alone.
(2) Any pretrial determination by the judge that a defendant is not mentally retarded shall not preclude the defendant from raising the issue at the penalty phase, nor shall it preclude any instruction to the jury pursuant to this Section.
D. Once the issue of mental retardation is raised by the defendant, and upon written motion of the district attorney, the defendant shall provide the state, within time limits set by the court, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any defense expert in forming the basis of his opinion that the defendant is mentally retarded.
E. By filing a notice relative to a claim of mental retardation under this Article, the defendant waives all claims of confidentiality and privilege to, and is deemed to have consented to the release of, any and all medical, correctional, educational, and military records, raw data, tests, test scores, notes, behavioral observations, reports, evaluations, expert opinions, and any other such information of any kind or other records relevant or necessary to an examination or determination under this Article.
F. When a defendant makes a claim of mental retardation under this Article, the state shall have the right to an independent psychological and psychiatric examination of the defendant. A psychologist conducting such examination must be licensed by the Louisiana State Board of Examiners of Psychologists. If the state exercises this right, and upon written motion of the defendant, the state shall provide the defendant, within time limits set by the court, any and all medical, correctional, educational, and military records, and all raw data, tests, test scores, notes, behavioral observations, reports, evaluations, and any other information of any kind reviewed by any state expert in forming the basis of his opinion that the defendant is not mentally retarded. If the state fails to comply with any such order, the court may impose sanctions as provided by Article 729.5.
G. If the defendant making a claim of mental retardation fails to comply with any order issued pursuant to Paragraph D of this Article, or refuses to submit to or fully cooperate in any examination by experts for the state pursuant to either Paragraph D or F of this Article, upon motion by the district attorney, the court shall neither conduct a pretrial hearing concerning the issue of mental retardation nor instruct the jury of the prohibition of executing mentally retarded defendants.
H. (1) "Mental retardation" means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, and practical adaptive skills. The onset must occur before the age of eighteen years.
(2) A diagnosis of one or more of the following conditions does not necessarily constitute mental retardation:
(a) Autism.
(b) Behavioral disorders.
(c) Cerebral palsy and other motor deficits.
(d) Difficulty in adjusting to school.
(e) Emotional disturbance.
(f) Emotional stress in home or school.
(g) Environmental, cultural, or economic disadvantage.
(h) Epilepsy and other seizure disorders.
(I) Lack of educational opportunities.
(j) Learning disabilities.
(k) Mental illness.
(l) Neurological disorders.
(m) Organic brain damage occurring after age eighteen.
(n) Other handicapping conditions.
(o) Personality disorders.
(p) Sensory impairments.
(q) Speech and language disorders.
(r) A temporary crisis situation.
(s) Traumatic brain damage occurring after age eighteen.
[4] The jury was charged that a factual finding of mental retardation would exempt defendant from capital punishment. In its opening statement in the penalty phase, the state informed the jury that "the defendant has given notice that he claims to be mentally retarded. Under Louisiana law, if you find that the defendant is mentally retarded, then he cannot be subjected to the death penalty."

Likewise, defense counsel's opening statement advised the jury that they would be "called upon to consider and determine whether Henry Anderson was mentally retarded. Mental retardation is a separate issue from mitigating circumstances.... If you find mental retardation, then your verdict cannot be the death penalty, even without any other mitigating circumstances."
And the trial court's penalty phase instructions notified the jury as follows:
A defendant who is mentally retarded may not be subjected to the death penalty. In determining whether the defendant is mentally retarded, you should consider all of the evidence presented bearing on the defendant[']s mental condition including the testimony of experts and other witnesses and the conduct and actions of the defendant. A defendant who makes a claim that he is mentally retarded must prove the allegation by a preponderance of the evidence. Thus the defendant must establish that it is more likely than not that he is mentally retarded. Mental retardation means a disability characterized by significant limitations in both intellectual functioning and adaptive behavior as expressed in conceptual, social, or practical adaptive skills. The onset must occur before the age of eighteen. Thereafter, the judge read to the jurors the diagnoses listed in LSA-C.Cr.P. art. 905.5.1(H)(2)(a) through (s). Finally, the judge instructed the jury: "In addition to considering whether a defendant is mentally retarded, you may also, you may consider any evidence regarding his mental condition as a mitigating circumstance in your consideration of proper sentence in this case."
[5] LSA-C.Cr.P. art. 744 provides in pertinent part: "The argument shall be confined to evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw there from, and to the law applicable to the case."
[6] LSA-C.Cr.P. art. 795(C): No peremptory challenge made by the state or the defendant shall be based solely upon the race of the juror. If an objection is made that the state or defense has excluded a juror solely on the basis of race, and a prima facie case supporting that objection is made by the objecting party, the court may demand a satisfactory racially neutral reason for the exercise of the challenge, unless the court is satisfied that such reason is apparent from the voir dire examination of the juror. Such demand and disclosure, if required by the court, shall be made outside of the hearing of any juror or prospective juror.